David P. Smith, OSB #964301
The Smith Firm, P.C.
1754 Willamette Falls Dr.
West Linn, OR 97068
P:     503-657-6550
F:     866-710-0666
E:     dave@thesmithfirmpc.com
Attorney for Defendants and Third-Party Plaintiffs
Advanced Investment Corp., Austin Walker,
John P. Rude, Christine A. Sullivan, DW&S, LLC, Steven
Nasset, Joanna Nasset, Charles D. Everard, Ada M. Everard,
Donna J. Swanson, Diane M. Duyck, Robbin Denise Freedman,
Schultz Real Estate Investments, LLC,
Michael Silvis, Robert Bayman, Eugene W. Gramzow,
John V. K. Fearing, Susan L. Baker, Emily R. Collins,
Neil L. Warne, Christy Warne, Mark Allen Ditgen,
Linda Carol Ditgen, Stephen F. Duffy,
Amy S. LaGrander, Margie Nemcik-Cruz, Jonny B. Watson,
Rex D. Ballenger, Bonnie L. Ballenger, Michael A. Welt,
Robert A. Zoller, Diana Greene, RH Ventures, LLC,
Ervin Wood, J&D OR Properties, LLC, Matthew David
Freedman, Carl M. Dutli, Margaret J. Brown Olson, John M.
Compton, Betty Compton, Kurt D. Connell, Erin Ronnie
Connell, Craig Alacano, Cynthia L. Alacano, Vic Mitchell
and Andrew Strickland

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OREGON JV LLC, a New York limited liability company,<br><br>                 Plaintiff,<br><br>   v.<br><br>ADVANCED INVESTMENT CORP. d/b/a AIC, an Oregon limited liability company, AUSTIN L. WALKER, an individual, ANTHONY J. FAVREAU AND CYNTHIA L. FAVREAU, Trustees of the Favreau Family Trust, JOHN P. RUDE AND CHRISTINE ANN SULLIVAN, individuals, DW&S, LLC, an Oregon limited liability company, CLS | Case No.: 3:22-cv-00337-HZ<br><br>**DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**<br><br>Fed. R. Civ. P. 56<br><br>**Request for Oral Argument** |

INVESTMENTS, LLC, an Oregon limited
liability company, JOANNA NASSET AND
STEVEN NASSET, Trustees of the J&S
Enterprises, CHARLES D. EVERARD, ADA
M. EVERARD, DONNA J. SWANSON, AND
DIANE M. DUYCK, individuals, ROBBIN
DENISE FREEDMAN, Trustee of the Robbin
Denise Freedman Revocable Living Trust,
SCHULTZ REAL ESTATE INVESTMENTS,
LLC, an Oregon limited liability company,
ROBERT EDISON SILVIS AND MICHAEL
J. SILVIS, Trustees for the Silvis Family
Revocable Trust, ROBERT BAYMAN AND
DELORES BAYMAN, individuals, EUGENE
W. GRAMZOW, Trustee for the "Eugene W.
Gramzow Revocable Trust", JOHN V. K.
FEARING AND SUSAN L. BAKER, Co-
Trustees of the Baker Fearing Trust, EMILY R.
COLLINS, an individual, NEIL L. WARNE
AND CHRISTY WARNE, individuals, MARK
ALLEN DITGEN AND LINDA CAROL
DITGEN, individuals, STEPHEN F. DUFFY,
an individual, AMY S. LA GRANDER, an
individual, MARGIE NEMCIK-CRUZ, an
individual, JONNY B. WATSON, an
individual, REX D. BALLENGER AND
BONNIE L. BALLENGER, individuals,
MICHAEL A. WELT, an individual, ROBERT
A. ZOLLER AND DIANA GREENE,
individuals, RH VENTURES, LLC, an Oregon
limited liability company, ERVIN WOOD, an
individual, J & D OR PROPERTIES, LLC, an
Oregon limited liability company, MATTHEW
DAVID FREEDMAN, Trustee of the Matthew
David Freedman Revocable Trust, CARL M.
DUTLI, Trustee of the CMD Retirement Trust,
MARGARET J. BROWN OLSON, Trustee of
the Margaret J. Brown Trust, JOHN M.
COMPTON AND BETTY COMPTON,
individuals, KURT D. CONNELL AND ERIN
RONNIE CONNELL, individuals, CRAIG
ALACANO AND CYNTHIA L. ALACANO,
Co-Trustees of the Craig and Cynthia Alacano
Joint Trust, VIC MITCHELL, an individual,
and ANDREW STRICKLAND, an individual,

                   Defendants.

ADVANCED INVESTMENT CORP. d/b/a
AIC, an Oregon limited liability company,

AUSTIN L. WALKER, an individual, JOHN P.
RUDE AND CHRISTINE ANN SULLIVAN,
individuals, DW&S, LLC, an Oregon limited
liability company, JOANNA NASSET AND
STEVEN NASSET, Trustees of the J&S
Enterprises, CHARLES D. EVERARD, ADA
M. EVERARD, DONNA J. SWANSON, AND
DIANE M. DUYCK, individuals, ROBBIN
DENISE FREEDMAN, Trustee of the Robbin
Denise Freedman Revocable Living Trust,
SCHULTZ REAL ESTATE INVESTMENTS,
LLC, an Oregon limited liability company,
MICHAEL J. SILVIS, Trustee for the Silvis
Family Revocable Trust, ROBERT BAYMAN,
Trustee for the Robert and Delores Bayman
Revocable Living Trust, EUGENE W.
GRAMZOW, Trustee for the "Eugene W.
Gramzow Revocable Trust", JOHN V. K.
FEARING AND SUSAN L. BAKER, Co-
Trustees of the Baker Fearing Trust, EMILY R.
COLLINS, an individual, NEIL L. WARNE
AND CHRISTY WARNE, individuals; MARK
ALLEN DITGEN AND LINDA CAROL
DITGEN, individuals, STEPHEN F. DUFFY,
an individual, AMY S. LA GRANDER, an
individual, MARGIE NEMCIK-CRUZ, an
individual, JONNY B. WATSON, an
individual, REX D. BALLENGER AND
BONNIE L. BALLENGER, individuals;
MICHAEL A. WELT, an individual, ROBERT
A. ZOLLER AND DIANA GREENE,
individuals, RH VENTURES, LLC, an Oregon
limited liability company, ERVIN WOOD, an
individual, J & D OR PROPERTIES, LLC, an
Oregon limited liability company, MATTHEW
DAVID FREEDMAN, Trustee of the Matthew
David Freedman Revocable Trust, CARL M.
DUTLI, Trustee of the CMD Retirement Trust,
MARGARET J. BROWN OLSON, Trustee of
the Margaret J. Brown Trust, JOHN M.
COMPTON AND BETTY COMPTON,
individuals, KURT D. CONNELL AND ERIN
RONNIE CONNELL, individuals, CRAIG
ALACANO AND CYNTHIA L. ALACANO,
Co-Trustees of the Craig and Cynthia Alacano
Joint Trust, VIC MITCHELL, an individual,
and ANDREW STRICKLAND, an individual

       Third-Party Plaintiffs,

   v.

MENACHEM SILBER, an individual,

        Third-Party Defendant.

### LOCAL RULE 7-1 COMPLIANCE

Pursuant to Local Rule 7-1(a), the undersigned counsel for Defendants conferred in good faith with counsel for Plaintiff by telephone on May 1, 2025, and the parties were unable to resolve the issues in dispute.

### MOTION

Pursuant to Federal Rule of Civil Procedure ("FRCP") 56, Defendants move for summary judgment on all of Plaintiff's claims for relief, excepting negligent misrepresentation which was already dismissed by this Court in its September 6, 2024 Opinion and Order ("MSJ Opinion"). This Motion is supported by the following Memorandum of Points and Authorities, the Declaration of David P. Smith ("Smith Decl. (2025)"), and the Court's record herein including previously filed Declarations in support of summary judgment: the Declaration of David P. Smith and exhibits (ECF Doc. No. 111) ("Smith Decl. (2023)"), the Declaration of Austin L. Walker and exhibits (ECF Doc. No. 113) ("Walker Decl."), the Declaration of David Duncan (ECF Doc. No. 112) ("Duncan Decl."), the Declaration of David P. Smith in Support of MSJ Reply and exhibits (ECF Doc. No. 135) ("Smith Decl. (2024)"), and the Declaration of Joseph P. Russi and exhibits (ECF Doc. No. 140) ("Russi Decl.").

The Motion should be granted because there is no genuine dispute as to any material fact and as a matter of law, Plaintiff cannot prevail on its claims. If the Court denies summary judgment in whole on Plaintiff's unjust enrichment claim, Defendants request that the Court grant partial summary judgment on the relief sought on that claim to permit Defendants to proceed with nonjudicial foreclosure to mitigate their damages.

**TABLE OF CONTENTS**

A.   LEGAL STANDARD ........................................................................................... 7

B.   INTRODUCTION .............................................................................................. 7

C.   PARTIES & OTHER KEY PLAYERS ................................................................ 8

D.   INDISPUTABLE FACTS .................................................................................. 11

E.   ARGUMENT .................................................................................................... 43

    *1.   First Claim for Relief: Fraud in the Inducement/Promissory Fraud* ......................... *43*

        (a)   Defendants Made no Misrepresentations ................................................. 45

        (b)   There was no Falsity or Knowledge Thereof ........................................... 47

        (c)   There was no Intent on the Part of Defendants ........................................ 47

        (d)   No Justifiable Reliance ........................................................................... 48

        (e)   Plaintiff Has Not Been Damaged ............................................................ 50

    *2.   Second Claim for Relief: Unjust Enrichment* .................................................... *51*

        (a)   There are Valid and Enforceable Contracts in Place that Displace this Claim ......... 52

        (b)   There is no Reasonable Basis for the Claim ............................................. 54

        (c)   Defendants Have Not, in Fact, Been Unjustly Enriched ........................... 54

        (d)   This is a Claim for Equitable Relief ....................................................... 54

    *3.   Fourth Claim for Relief: Recission based upon Mutual Mistake of Fact* ................... *55*

F.   CONCLUSION .................................................................................................. 56

## TABLE OF AUTHORITIES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)....................................................................7

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)...............................................................................7

*Cocchiara v. Lithia Motors, Inc.*, 353 Or. 282, 297 P.3d 1277 (2013) ..........................................44

*Conzelmann v. N. W. P. & D. Prod. Co.*, 190 Or. 332, 225 P.2d 757 (1950) ..............................44

*Ellison v. Watson*, 53 Or. App. 923, 633 P.2d 840 (1981) ...........................................................55

*Frank v. Fitz Enterprises, Inc.*, 106 Or. App. 183, 806 P.2d 720 (1991) ......................................46

*Gardner v. Meiling*, 280 Or. 665, 675, 572 P.2d 1012 (1977) ....................................44, 48, 55, 56

*Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107 (9th Cir. 2003) ................................................7

*In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010) ..........................................................7

*Jaqua v. Nike, Inc.*, 125 Or. App. 294, 865 P.2d 442 (1993) .......................................................51

*Kashmir v. Patterson*, 43 Or. App. 45, 602 P.2d 294 (1979) .......................................................52

*Kizer Excavating Co. v. Stout Bldg. Contractors, LLC*, 324 Or. App. 211, 525 P.3d 883 (2023) 51

*Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 404 P.3d 912 (2017) ................51, 54

*Lesher v. Strid*, 165 Or App 34, 996 P.2d 988 (2000).................................................................55

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .....................................7

*Mt. Hood Community College v. Federal Ins. Co.*, 199 Or. App. 146, 111 P.3d 752 (2005).......53

*Murphy v. Allstate Ins. Co.*, 251 Or. App. 316, 284 P.3d 524 (2012) ..........................................48

*OPERB v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 83 P.3d 350 (2004).....................44, 48

*Porter Constr. Co. v. Berry*, 136 Or. 80, 298 P. 179 (1931) ........................................................53

*Riley Hill Gen. Contractor, Inc. v. Tandy Corp.*, 303 Or. 390, 737 P.2d 595 (1987) .............43, 44

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ................................................54

*Speciality Risk Servs. v. Royal Indem. Co.,* 213 Or. App. 620, 164 P.3d 300 (2007) ..................51

*Strawn v. Farmers Ins. Co. of Oregon*, 350 Or. 336, 258 P.3d 1199 (2011). ..............................43

*Vukanovich v. Kine,* 268 Or. App. 623, 342 P.3d 1075 (2015)....................................................50

*Wilson v. Gutierrez*, 261 Or. App. 410, 323 P.3d 974 (2014) ......................................................51

Federal Rule of Civil Procedure 56(a).............................................................................................7

## MEMORANDUM OF POINTS AND AUTHORITIES

### A.    LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FRCP 56(a).  *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.").  The moving party has the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof at trial, the moving party only needs to prove that there is an absence of evidence to support the non-moving party's case.  *Id.* at 325.

The burden then shifts to the non-moving party to identify specific facts showing the existence of genuine issues for trial.  *Id.* at 324.  "This burden is not a light one."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  A nonmoving party cannot defeat summary judgment by relying on "unsupported conjecture or conclusory statements."  *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  The non-moving party must show more than the mere existence of a scintilla of evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Rather, the non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor.  *Id.*

### B.    INTRODUCTION

This case arises from Defendants' construction loans to Joseph Russi ("Russi") – a builder in Oregon – and Plaintiff's subsequent assumption of those loans (the "Loans") via contracts (the "Assumption Agreements").  As part of the Assumption Agreements, Defendants consented to the transfer of ownership of the underlying properties from Russi to Plaintiff.  Plaintiff has sued Defendants, alleging it was induced into assuming the Loans by virtue of

various representations and omissions. The truth is, Plaintiff's principal, Mike Silber, went into the transactions with eyes wide open, after conducting extensive due diligence, and now seeks to blame Defendants for the choices made by Silber in investing in a distressed project and taking shortcuts to his detriment.

Defendants did not get involved with Silber until some eleven months after Silber began working Russi into a corner with various usurious loans, at which point, Defendants provided all information requested by Silber prior to the assumption of the Loans. All information provided by Defendants was accurate and included in the Assumption Agreements that were executed by each Defendant Lender and Plaintiff. There were no false representations or omissions made by any Defendant, nor is there any evidence of such because they did not occur. Plaintiff cannot prevail on any of its claims and summary judgment is warranted.

## C.    PARTIES & OTHER KEY PLAYERS

Defendant Lenders are individual lenders, described with particularity in Paragraphs 6 through 37 of Plaintiff's Second Amended Complaint, who made construction loans to Russi and then agreed to Plaintiff's assumption of those loans and the transfer of the underlying real property to Plaintiff. Defendant Advanced Investment Corp. ("AIC") is a real estate investment company who serviced the construction loans for Defendant Lenders. Russi was the builder and general contractor for multiple construction projects in Oregon, including those tied to the Loans at issue in this lawsuit. Russi owned the underlying real property (the "Properties"), either personally or via First Phase LLC, and executed trust deeds in favor of each Defendant Lender as collateral for the Loans, with each Defendant Lender being in first priority position, with the exception of the DW&S, LLC loan which was in a subordinate position. Russi did business as Mid Oregon Builders, LLC ("MOB") and worked closely with David Duncan ("Duncan"), who was his construction lead.

Plaintiff is a New York limited liability company registered with the New York Secretary of State on February 3, 2021 and as a foreign limited liability company in Oregon on March 17, 2021.[1]  Plaintiff's authority to conduct business in Oregon was revoked on May 18, 2023.[2] Menachem Silber, also known as Mike Silber ("Silber"), was a member of Plaintiff when it was registered in Oregon.[3]  Silber signed the Assumption Agreements on behalf of Plaintiff and was in charge of gathering all relevant information and conducting due diligence before doing so. Silber was also a principal of TopRock Funding LLC ("TopRock"), a New York limited liability company registered with the New York Secretary of State on August 6, 2019.[4]  TopRock did business as Chrome Capital, Fastcap Lenders, Teal Funding, Cashable, and Credit League.[5]

As of June 2020, TopRock was owned by Silber, Berel (Barry) Farkas, and Wolf Wercberger.[6]  Silber and Farkas are also co-owners of BFMS Property Holdings LLC ("BFMS") which does business as Lightstone Management.[7]  BFMS was one of the several companies that wired money to AIC for interest payments due under the Assumption Agreements.[8]  Mark Raksin is the Director of Operations for Lightstone Management and was involved in running operations and financials for Plaintiff and Stone Creek Building and Construction, LLC.[9]  Raksin was listed as the Manager for Plaintiff on the Oregon Secretary of State Corporation Division

---

[1] Smith Decl. (2023), Ex. 1.

[2] Smith Decl. (2025), Ex.15. *See also id.*, Ex. 16 (NY Secretary of State shows Plaintiff's statement status as past due because it was due on February 28, 2023).

[3] Smith Decl. (2023), Ex. 2.

[4] *Id.*, Ex. 4; Ex. 20 at 2, 6 (listing Silber as managing member of TopRock). *See also* Smith Decl. (2023), Ex. 4 (NY Secretary of State shows TopRock's statement status as past due because it was due on August 31, 2021).

[5] *Id.*, Ex. 4 at 2.

[6] *Id.* at 4.

[7] *Id.* at 4, 10, & 13.

[8] Walker Decl., Ex. 7.

[9] Smith Decl. (2023), Ex. 4 at 17.

website on Plaintiff's amended annual report filed in August 2022.[10]

Silber was also connected with Sapphire Key Group (although denies knowledge of it) and retained two of his associates from that entity to inspect the Properties in October 2020: Ari Stock and Asher Ehrman (aka Jason Phillips).[11]  In his deposition, Silber couldn't recall where Mr. Ehrman worked in 2020, possibly as a medical supplies broker, and testified that Ari Stock had a lot of construction experience.[12] In addition to Silber, Stock, and Ehrman all having @sapphirekeygroup.com email addresses, many emails between Silber and Ehrman show that Ehrman has an @tealfunding.com email address.[13]  Teal Funding is a dba for TopRock.[14]  Silber denied any business affiliation with Ehrman and categorized him as a friend.[15]

Jeremy Parmenter ("Parmenter) is a local realtor who worked intimately with Silber and Russi as further set forth in the facts section below.[16]  One of the issues raised by Plaintiff for the first time in its Response to Defendants' prior MSJ was the allegation that Parmenter was AIC's "agent."[17]  Deposition testimony confirmed the documentary evidence that Parmenter was not AIC's agent and in fact, was working for and on behalf of Silber during the due diligence period:[18]

> Q. Did you know that Oregon JV has -- and Mike Silber have taken the position in this lawsuit that you were the agent of AIC and Austin Walker?

---

[10] *Id.*, Ex. 3.

[11] Smith Decl. (2023), Ex. 24 at 4 (all have @sapphirekeygroup email addresses); Smith Decl. (2025), Ex. 1 (Silber Depo, 61:18-21).

[12] Smith Decl. (2025), Ex. 1 (Silber Depo., 111:11-112:11).

[13] *See, e.g.,* Smith Decl. (2023), Ex. 19 at 35.

[14] Smith Decl. (2023), Ex. 4 at 2.

[15] Smith Decl. (2025), Ex. 1 (Silber Depo. 88:19-89:17).

[16] Smith Decl. (2025), Ex. 2 (Duncan Depo. 93:10-15) ("… Jeremy came in as our realtor because he -- I brought him in to Mid Oregon because our realtors -- we weren't selling like we wanted to. And then Jeremy slowly, you know, built into trying to help find someone to buy the company.")

[17] Note that this agency relationship is not pleaded which is why Defendants objected to this being a basis for denial of the MSJ as outside the scope of the pleadings.

[18] *See, e.g.*, Smith Decl. (2025), Ex. 3 (Russi Depo. 217:20-24).

A. I read that the other day.

Q. That's not true, is it?

A. Correct.

                 ***

Q. My point is that all the due diligence we've been talking about in terms of the inspections, the looking at the title report, pulling comps, finding out what loans are on the property, all of that was done for Mike Silber. It had nothing to do with AIC; right?

A. That's correct.[19]

Additionally, Plaintiff has now admitted that Parmenter was its agent no later than February 2021, before the Assumption Agreements were executed.[20]

    Parmenter was also the principal of Stone Creek Building and Construction, LLC ("Stone Creek").[21]  Stone Creek was the company retained by Silber and Plaintiff to complete construction on the properties Plaintiff obtained from Russi despite Parmenter's lack of construction experience on projects of this magnitude.[22]

## D.    INDISPUTABLE FACTS

    There is a long and complex history here due to the number of transactions relating to Russi's holdings, including those outside of this lawsuit.  A bullet point summary of the key facts is below, followed by a more developed recitation of the facts with citations to the supporting evidence:

- Russi's construction projects began to slow progress in late 2019 due to his wife being ill with cancer along with the large volume of projects he was working on and lack of accessibility to subcontractors in Douglas County and then, the

---

[19] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 196:13-18, 197:19-25).
[20] Smith Decl. (2025), Ex. 5.
[21] Smith Decl. (2023), Ex. 5.
[22] Smith Decl. (2025), Ex. 2 (Duncan Depo. 181:6-24).

COVID pandemic lockdown.

- Beginning in January of 2020, Russi began borrowing money from TopRock/Silber in a predatory lending scheme.  With each "loan," Russi got in deeper, agreeing to yet another usurious loan in March of 2020 requiring him to execute a $1.3 million promissory note in favor of TopRock/Silber and a Trust Deed as collateral for the note which encumbered the entire Russi portfolio (in various subordinated positions to Defendant Lenders).

- Russi filed bankruptcy in July 2020, and soon after, he began working with Silber on a plan for the bankruptcy to be released which included Silber purchasing Russi's entire real estate portfolio and assuming all of the loans on Russi's properties, including the Properties.

- In October 2020, Parmenter obtained limited information on the Loans from AIC and provided that information to Silber.  Parmenter also created a spreadsheet using the Loan information and added sales prices, cost to finish construction, etc., which Parmenter then provided to Silber.

- On at least two occasions, and prior to the Assumption Agreements being executed, Plaintiff and/or its representatives or employees visited the Properties to conduct detailed inspections.  Plaintiff also conducted extensive due diligence to review information about the Properties, Russi, and his debts and determined Plaintiff would need to invest approximately $20 million to complete construction on the properties in the Russi portfolio.

- Prior to execution of the Assumption Agreements and prior to the second due diligence inspection in February of 2021, Parmenter informed Silber he was

concerned about quality of workmanship at the Russi properties. Silber asked no follow-up questions, did not hire a professional to inspect the Properties, and never looked at the City or County building inspection files.

- The Assumption Agreements were executed in April of 2021 and they each list the note amount and the construction reserve balance amount. Silber never asked for Loan files or details on the construction draws.

- The Assumption Agreements were amended six months later (Nov. 2021) and the only issues raised at that time were needing more time to get the permits transferred to Stone Creek and the construction completed. No issues with workmanship were raised after more than six months of Stone Creek working on the Properties.

- Plaintiff did not mention any of the issues alleged in this lawsuit until it realized all avenues had been exhausted to obtain title insurance for the deeds so that Plaintiff could sell the Properties. The primary reason that title insurance could not be obtained is because of Plaintiff's own prior actions rushing to take over ownership of the Properties outside of standard title processes.

- Despite Parmenter's supposed concern with MOB's workmanship, he entered into a $3.5 million contract in February 2022 to buy another Russi project (Safari) where the lender had foreclosed, thus, clearing title.

AIC began working with Russi in January 2018 and in total, AIC helped Russi acquire over 100 building lots for the construction of homes, including the Properties.[23] Russi was in charge of obtaining construction loans and Duncan would write up the construction budget

---

[23] Second Amended Complaint, ¶ 46; Walker Decl., ¶ 3.

estimates based on MOB having an in-house crew and ordering supplies in bulk.[24]  All of the

construction budgets were developed pre-COVID; the global pandemic drove up the price of

materials significantly and caused MOB to lose a lot of employees, thus slowing construction,

while interest on loans continued to accrue.[25]

The bulk supplies – granite countertops, plumbing, interior doors and trim, windows,

sinks, carpet, linoleum, OSB sheathing, plywood, lighting, cabinet packs, etc. – were stored in

the MOB warehouse and organized in bays.[26]  Another member of MOB, Shea Cambridge, was

responsible for submitting construction draw requests.[27]  MOB retained various real estate agents

to conduct competitive market analyses ("CMAs") for the construction loan applications.[28]  The

construction loan amounts were based on the estimated sales price and not the construction

budget.[29]

Both Duncan and Russi testified that Russi would often contribute to MOB's construction

projects:

> Q. … You didn't know what your budget was, but Mr. Russi, if he was going to
> go out and get a loan from AIC, wouldn't he have to provide some information to
> AIC about what he wanted for money?
>
> A. Well, we didn't borrow 100 percent of what we needed.
>
> Q. What percent did you borrow?
>
> A. Every project was different I'm sure. I mean, I didn't do the loans so I'm really
> not up to speed, but I know Joe personally put money in the projects to make it
> work.

\*\*\*

---

[24] Smith Decl. (2025), Ex. 2 (Duncan Depo. 31:3-10, 32:6-34:9, 215:2-219:8); & Ex. 3 (Russi Depo. 118:13-119:3).

[25] Smith Decl. (2025), Ex. 2 (Duncan Depo. 166:11-168:23).

[26] Smith Decl. (2025), Ex. 2 (Duncan Depo. 145:15-149:24; 215:2-219:8) & Ex. 3 (Russi Depo. 191:14-193:13).

[27] Smith Decl. (2025), Ex. 3 (Russi Depo. 123:17-25) & Ex. 2 (Duncan Depo. 126:3-11).

[28] Smith Decl. (2025), Ex. 3 (Russi Depo. 99:2-24, 118:19-119:3).

[29] Smith Decl. (2025), Ex. 2 (Duncan Depo. 80:19-21, 82:9-15, 98:16-99:2).

A. Well, again, I've told you five times or more the loans have nothing to do with the cost to build. The cost to build schedule isn't necessarily what we borrowed. I mean, I know Joe put in money.

\*\*\*

Q. And did you -- how much money did you contribute to MOB so it had money in its bank accounts?

A. I think over the span of time was in excess of 800,000.

\*\*\*

A. So you get into building a house and you go in with a budget. They loan you a percentage of your estimate. Then all of a sudden the Geotech determines that you have to have a daylight basement where we weren't planning on one, or a bigger one. The house all of a sudden goes from 1600 square feet to 2500 square feet. And we may have budgeted 4,000 for the foundation and it ended up costing 25,000.

\*\*\*

A. I wasn't a part of putting those draws together so I very rarely -- I just know when I was asked, we need X number of dollars in the account to be able to do whatever we needed to do, then it was up to me to go find the money or take personal money if it was available and put in.[30]

In late 2019, Russi's construction work slowed due to the large volume of projects he had taken on and his inability to obtain subcontractors in Douglas County.[31]  When asked whether MOB had taken on too much work, Russi explained that:

> [D]own here it's not like it is in the big city where you've got ten different HVAC companies. You're lucky to get one down here to do new construction. And so if that guy is busy or didn't get to the job, then the trades after him can't come in.
>
> So it's likely when we have about seven, eight houses that were all needing basically the same thing at a certain time it could set you back easy three months waiting on those trades to come in. And the reason we needed HVAC, electrical, and plumbing is because you had to have a special license, as you know, for that.

---

[30] Smith Decl. (2025), Ex. 2 (Duncan Depo. 86:15-25, 113:24-25, 122:3-6) & Ex. 3 (Russi Depo. 24:10-14, 29:19-30:10 (MOB self-funded shortfalls), 75:9-19, 81:6-11).

[31] Duncan Decl., ¶ 3; Russi Decl., ¶ 6.

We could not do that in-house.[32]

Late 2019 is also when Russi got into a dispute with Ross Murray of VASE, LLC ("VASE") about the buildability of a parcel that VASE sold Russi which ended up in litigation.[33] November 2019 is when Russi first met Parmenter.[34]

In January of 2020, with the "help" of Jason Phillips/Asher Ehrman of Teal Funding (one of the TopRock dbas) and Silber, Russi signed multiple "revenue purchase agreements" including one to obtain $125,000 ($112,500 with fees subtracted) in exchange for paying TopRock $187,375 within a month.[35] While the contract listed $125,000 as the "purchase price" or the amount Russi would get, Silber emailed TopRock's head underwriter that the net funding that should be wired to MOB was only $85,000.[36] Very fitting then that Plaintiff's documents note: "THIS DEAL IS CRAAAAAZY."[37] In February of 2020, Russi emailed Silber a list of all his real estate holdings with current balances and projected values.[38] Russi also borrowed more money from TopRock on February 21, 2020.[39] Duncan testified that Silber's representatives (Ari Stock and Asher Ehrman) told him during their visit to Oregon that this is Silber's *modus operandi*:

> A. …And then they [Ari and Asher] told me that this is Mike -- Mike Silber set this thing up. That's what he does, he loans you just enough money to get in trouble and then he takes over. That's kind of their -- how they do it.
>
> ***
>
> Q. And what else did they say about those loans and what their plan was?

---

[32] Smith Decl. (2025), Ex. 3 (Russi Depo. 132:10-24).

[33] *See* Douglas County Circuit Court Case No. 20CV12948.

[34] Russi Decl., ¶ 17; Smith Decl. (2025), Ex. 3 (Russi Depo. 130:18-131:6).

[35] Smith Decl. (2023), Ex. 7. *See also* Russi Decl., Exs. 2 & 3 (Nanoflex Capital Future Receivables Sale and Purchase Agreement which Silber needed to approve).

[36] Smith Decl. (2023), Ex. 7 at 15.

[37] Russi Decl., Ex. 3.

[38] Smith Decl. (2023), Ex. 8.

[39] Smith Decl. (2023), Ex. 9.

A. Well, they said that that's how they take over companies. They leverage you and get you in trouble, and then they come in and buy you out. That was their plan.[40]

In March 2020, when the COVID-19 pandemic lockdown occurred, all work on Russi's projects stalled due to construction work not being considered an essential service at that point.[41] Many of Russi's employees left and with the global shutdown, he was unable to obtain building inspections required to move the projects forward.[42] Further, the pandemic interfered with real estate sales for a time because of social distancing and lockdowns.[43] Russi was also dealing with serious personal issues including the fact that his wife was ill and was being treated in Seattle.[44] One of Russi's lenders, Veristone, shut down and stopped paying draws.[45]

Russi had signed a confession of judgment in relation to his dispute with VASE and that judgment was entered on March 18, 2020.[46] Because Russi's entire real estate portfolio was owned by him individually at the time, the judgment filed in the lawsuit attached to Russi's entire portfolio and he could not sell any of his projects until the judgment was satisfied. In the meantime, Russi continued to borrow money from TopRock.[47]

Silber had Russi cornered and on March 26, 2020, Russi executed a promissory note in favor of Silber via TopRock in the amount of $1,295,862.50[48] and at the lesser of (a) interest rate

---

[40] Smith Decl. (2025), Ex. 2 (Duncan Depo. 138:17-21; 139:17-22); Russi Decl., ¶¶ 7-11 ("I believe that these predatory initial agreements funded by TopRock were designed to put Mid Oregon into financial distress and lock Mid Oregon into doing business with Silber and TopRock, and, in any event, that was the net result.")

[41] Smith Decl. (2023), Ex. 10.

[42] Duncan Decl., ¶ 4; Smith Decl. (2025), Ex. 2 (Duncan Depo. 166:11-168:23); Russi Decl., ¶ 13.

[43] Russi Decl., ¶ 13.

[44] Smith Decl. (2023), Ex. 11 at 2; Russi Decl., ¶ 14.

[45] Smith Decl. (2025), Ex. 2 (Duncan Depo. 94:20-24).

[46] Smith Decl., Ex. 6 at 38 (Preliminary Title Report, Exception 139, Douglas County Circuit Court Case No. 20CV12948).

[47] Smith Decl. (2023), Ex. 9 (March 20, 2020 loan).

[48] Russi testified that he never received anywhere near this amount – at most it was $600,000 owed. Smith Decl. (2025), Ex. 3 (Russi Depo. 177:8-178:13).

of 6% per month, **or 72% per year,** (b) "and the maximum rate allowed under Oregon Criminal Law."[49]  Russi also signed Trust Deeds as collateral for the promissory note which encumbered the entire Russi portfolio.[50]  All of this was unknown to Defendants at the time, including the fact that the loans made by Silber were made outside of the industry standard escrow process and without title insurance although Silber did end up getting title insurance for 0 Danielle Drive, the 38-acre parcel which was included in a second trust deed but associated with the same promissory note.[51]

After Russi executed the promissory note and blanket trust deed in favor of Silber via TopRock, Parmenter was communicating with Silber and his counsel on Russi's behalf to release TopRock's lien on several properties that Russi had pending sale.[52]  Silber would not agree and then was nonresponsive which further delayed home sales from occurring in May 2020.[53]  On or around May 2020, Russi reached out to AIC and informed them of some issues including the fact Russi was unable to complete home sales due to the VASE, LLC judgment and the blanket lien that TopRock had on all Russi's properties.[54]

Based on AIC's previous experiences with Russi, AIC, with the aid of investor DW&S, LLC, worked out a plan to help by paying off the VASE judgment, paying TopRock $200,000 to release some of the properties from its blanket lien, and removing other obstacles including providing additional funding to complete construction to be able to execute home sales.[55]  The

---

[49] Smith Decl. (2023), Ex. 12 at 1-2.
[50] Smith Decl. (2023), Exs. 13 & 14.
[51] Smith Decl. (2023), Ex. 16; *compare* Smith Decl. (2023), Ex. 13 to Ex. 14 (see Exhibit A of each, also compare the Certificate Page of each which has a recitation from Western Title on Ex. 13 that recording the instrument is an accommodation only and it assumes no liability because there was no title insurance on that part of the transaction).
[52] Smith Decl. (2023), Exs. 11 & 17.
[53] *Id.*
[54] Walker Decl., ¶ 4.
[55] Walker Decl., ¶ 5 & Ex. 1.

additional loan funds were disbursed in June 2020.[56]

On July 16, 2020, Russi impetuously filed chapter 7 bankruptcy due to mounting pressure from Silber and his predatory lending practices and because of family issues including the fact that his wife was undergoing intensive chemotherapy and radiation.[57] Defendants were officially informed about the bankruptcy filing at the end of October 2020.[58] Defendants began working with the bankruptcy trustee to obtain a relief from the bankruptcy stay, starting with foreclosure on 23 of the Properties that were vested in First Phase.[59]

In parallel and unknown to Defendants at the time, Russi, with the help of Parmenter and Jason Phillips (aka Asher Ehrman), had begun working with Silber on a plan for Russi's bankruptcy to be released.[60] "Mike [was] calling me when I was in bankruptcy telling me, 'I can get you out of bankruptcy and I will buy out your company,' and doing all the promises that he made, that was the quickest way I saw for me to get all these investors paid."[61] This plan included the agreement for the sale of real property and the confession of judgement between Russi and Silber, ultimately signed by Russi on December 9, 2020.[62]

As part of information that Parmenter gathered for Silber, Parmenter reached out to AIC for a listing of the loans funded by Defendant Lenders which AIC serviced.[63] AIC emailed that list to Parmenter which contained the lender name, whether Russi or First Phase owned the

---

[56] Walker Decl., Ex. 1.

[57] Walker Decl., Ex. 2; Smith Decl. (2025), Ex. 3 (Russi Depo. 93:14-96:7); Russi Decl., ¶¶ 15-16.

[58] Walker Decl., Ex. 2; Smith Decl. (2025), Ex. 3 (Russi Depo. 93:14-17:
      "Q. So did AIC know that you were filing bankruptcy in July of 2020?
      A. Absolutely not. I didn't even know I was doing it until 8:30 at night.")

[59] Smith Decl. (2023), Ex. 18. The Order granting relief from the bankruptcy stay was drafted on December 16, 2020 and signed by the Judge on December 23, 2020. *Id.* at 5-12.

[60] Smith Decl. (2023), Exs. 19-20.

[61] Smith Decl. (2025), Ex. 3 (Russi Depo. 136:1-5).

[62] Smith Decl. (2023), Ex. 20.

[63] Walker Decl., ¶ 7.

Property, the total loan balance, reserve balance, property address and APN.[64]  Parmenter

provided that spreadsheet to Silber in multiple emails.[65]  Parmenter and his assistant, Donna

McIver then created another spreadsheet that included a cost breakdown of each of Russi's

communities and reflected the cost to finish, remaining construction loan reserves, total

construction loan balances, second lien positions, land positions for the subordinated lots, and

anticipated sales price for each property, including the Properties.[66]  Parmenter emailed this

spreadsheet to Silber.[67]  The spreadsheet prepared by Parmenter shows that the anticipated cost

to complete construction ($6.65 million) greatly exceeded the remaining $905,000 in

construction reserves including those on the Loans held by Defendant Lenders.[68]

In depositions, the ultimate source of the "cost to finish" information was somewhat

unsettled: Plaintiff and Silber testified they did not recall who provided the data,[69] Parmenter

testified that Duncan provided it to him originally and admitted that construction costs

quadrupled due to COVID,[70] and Duncan testified it may have come from him or from

Parmenter with Duncan's input.[71]  What is clear, though, is that <u>Defendants had no involvement</u>

whatsoever in providing the estimated cost to finish or sales price:

> Q. Let me ask this way: Where did the construction loan balance number
> originate from?
>
> A. That would have came from AIC.
>
> Q. And where would the reserve balance come from?

---

[64] Walker Decl., Ex. 3.

[65] Smith Decl. (2023), Ex. 22 & Ex. 19 at 36-37.

[66] Smith Decl. (2023), Ex. 23.

[67] Smith Decl. (2023), Ex. 19 at 5-19.

[68] *See id.* at 19.

[69] Smith Decl. (2025), Ex. 6 (ORJV Depo. 84:21-89:20) & Ex. 1 (Silber Depo. 189:23-25).

[70] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 61:3-64:13, 86:13-16; 87:5-89:15).  *See also id.* at Ex. 7 (October 7, 2020 emails of spreadsheets with handwritten cost-to-finish).

[71] Smith Decl. (2025), Ex. 2 (Duncan Depo. 72:18-73:14, 74:18-75:2).

A. AIC.

Q. So this would have been information you would have gotten from AIC?

A. Part of it, <u>with the exception of the cost to finish and the sales prices</u>.[72]

In fact, Parmenter testified in his deposition that reserve balances, loan balances, and principal

balances was the only information AIC provided to him or Silber in connection with Plaintiff's

assumption of the Loans.[73]  That is also the only information Silber requested from AIC.

Further, the information provided in the spreadsheet, specifically the cost to finish, was

provided to Silber by Parmenter on October 9, 2020, well in advance of the execution of the

Assumption Agreements six months later in April 2021, and was collected by Parmenter at

Silber's behest to help him determine feasibility:

Q. Is that -- nobody at AIC or Austin Walker was asking you to collect this
information, were they?

A. I don't believe so, no. No.

Q. So to the extent you were doing any work in October [2020]… to collect this
information, it was on behalf of Mike Silber or his team or Oregon JV; right?

A. Yes. I would believe so, yeah.[74]

Also in October of 2020, and unknown to Defendants at the time, Parmenter provided Silber

with a list of all Russi lenders in subordinate positions along with their associated debts.[75]  Russi

also provided Silber with an accounting of all subcontractors and suppliers that he owed monies

to around this time.[76]

---

[72] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 289:11-20) (emphasis added).

[73] *Id.* (Parmenter Depo. 361:8-16).

[74] *Id.* (Parmenter Depo. 92:19-99:14).

[75] Smith Decl. (2023), Ex. 26 at 1-2.

[76] Walker Decl., Ex. 5. *See also* Smith Decl. (2023), Ex. 26 at 3 (texts from Silber to Russi on October 15, 2020: "I
need to know what you owe other than real estate," "I'm not doing this half assed I want to know globally what your

On October 22, 2020, Silber sent two representatives, Ari Stock and Asher Ehrman (aka Jason Phillips with Teal Funding), to Oregon to meet with Russi, Parmenter, and Duncan.[77]  AIC was not involved with, or aware of, the inspection.[78]  On Silber's behalf, Ari and Asher toured the Russi properties, including the Properties (aside from the outlying ones), and took detailed notes and photographs of every property they saw.[79]  They also toured the MOB warehouse and office and took photographs of everything.[80]  They discussed what everything was costing based on an in-house crew and what was owed to subcontractors and material suppliers.[81]  Silber's representatives expressed to Russi and Duncan that they were impressed with the projects and did not raise any concerns about quality of workmanship.[82]

Silber testified that Ari and Asher emailed him photographs but "couldn't recall" if they sent him any other information about the Properties.[83]  Later, he testified that they'd mentioned some concerns with workmanship but again "couldn't recall" whether there were any email or text communications on the issue.[84]  In Plaintiff's FRCP 30(b)(6) deposition the next day, Silber testified that Asher or Ari "perhaps" took photographs and "couldn't recall" if those were provided to Plaintiff.[85]  Plaintiff also "couldn't recall" receiving any written communications about the inspection from Ari or Asher.[86]

---

[sic] in the hole for," "Suppliers, etc.").

[77] Smith Decl. (2023), Ex. 19 at 20 & Ex. 27.

[78] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 59:10-12) & Ex. 2 (Duncan Depo. 179:12-18).

[79] Duncan Decl., ¶ 5; Smith Decl. (2025), Ex. 2 (Duncan Depo. 131:12-17, 132:4-5, 134:5-7). *See also* Smith Decl. (2025), Ex. 4 (Parmenter Depo. 53:8-13) & Ex. 3 (Russi Depo. 182:10-184:22); Russi Decl., ¶ 18.

[80] Smith Decl. (2025), Ex. 3 (Russi Depo. 191:1-9) & Ex. 2 (Duncan Depo. 144:20-145:4).

[81] Smith Decl. (2025), Ex. 2 (Duncan Depo. 71:4-72:23).

[82] Smith Decl. (2025), Ex. 3 (Russi Depo. 183:4-8, 189:2-22) & Ex. 2 (Duncan Depo. 135:21-25).

[83] Smith Decl. (2025), Ex. 1 (Silber Depo. 98:18-99:8).

[84] Smith Decl. (2025), Ex. 1 (Silber Depo. 108:18-109:8).

[85] Smith Decl. (2025), Ex. 6 (ORJV Depo. 61:6-14, 64:2-21).

[86] Smith Decl. (2025), Ex. 6 (ORJV Depo. 65:21-66:8).

Silber's representatives were not only vetting the Properties but were helping Silber to get Russi out of bankruptcy so that Silber could take over the Properties. This is well before AIC was approached by Silber about the potential assumptions of the Loans. On November 4, 2020, Jason Philips/Asher Ehrman emailed a "Property Spreadsheet" to Silber and others, saying:

> Please find attached the Debt Sheet that Joe at Mid Oregon is planning on giving to the trustee. The main issue with this is he took one lump sum owed on a property and then broke up the property by each address and attached the lump sum to each property. Making it look like each property owes that amount. The numbers are so far off and make no sense at all. There is no way it will fly. Mike and I are feeling that if that is submitted the process of getting the BK thrown out is slight to none and it will just keep getting prolonged.
>
> <u>I added you to a shared google spreadsheet that was provided to us by Jeremy (Someone helping Joe out.) In there you get a clearer idea of the actual debt. After all construction is done and everything finished we were looking at about 22M total out of pocket.</u>[87]

On November 7, 2020, Jason Philips/Asher Ehrman emailed Parmenter and Silber with an attachment "Revised Debt Sheet," and explained: "I put together a sheet with 2 tabs. … The 2nd tab is all the debt per sub division divided by the number of properties in that sub division The market value after full completion and the current market value."[88]

Soon thereafter, in December of 2020 and while Russi was still in bankruptcy, Silber agreed to waive the amount owing on the March 26, 2020 TopRock loan to Russi which allegedly totaled $1,295,862.50 but because of default interest and fees (and usury), now had nearly **doubled to $2,295,699.47 within less than nine months.**[89] Silber also agreed to release TopRock's lien position on the March 2020 loan to Russi and, in exchange for the release and the waiver, Russi agreed to transfer all of the properties owned by him individually and by his

---

[87] Smith Decl. (2023), Ex. 19 at 22.
[88] Smith Decl. (2023), Ex. 19 at 35.
[89] Smith Decl. (2023), Ex. 20 at 1.

DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT - Page 23

LLC, First Phase, LLC to TopRock (the "Transfer Agreement").[90]  The Transfer Agreement also

committed TopRock to pay Russi $250,000 along with additional amounts once TopRock/Silber

completed the development of the properties listed in Exhibit 1 of the Transfer Agreement.[91]

After the Transfer Agreement was executed, on December 16, 2020, Silber reached out to

each of Russi's senior lenders: AIC, Veristone, and Gallic, expressing his intent to step in and

take over all the projects including those tied to the Loans from Defendant Lenders.[92]  Silber's

emails to each lender are virtually identical:

> Nice meeting you again; apologies about my absence of recent I think we are
> finally trying to put an agreement in place between us.
>
> As I am sure you know, we have every intention of stepping in and taking over
> these projects and seeing it through completely, which by default, will satisfy all
> of us across the board.
>
> With that said, I've looped in my attornies here and brought them up to speed as to
> where we stand today; while speaking to them, I thought that perhaps the simplest
> option and most expedited one would be to amend the notes and at the same time
> keep your current lien positions which will allow us both to have the protection
> needed.[93]

Russi testified that to his knowledge, Silber had no communication with AIC or Walker until

after the Transfer Agreement was signed: "Austin was extremely surprised when I called him to

let him know that I needed to meet with him about somebody that was going to be taking over

for me and wanted to take over all the loans."[94]  This is bolstered by the fact that Parmenter

texted Silber on December 2, 2020, referencing Austin Walker and Silber responded "Who's

---

[90] Smith Decl. (2023), Ex. 20.

[91] *Id.* at 3.

[92] Smith Decl. (2023), Exs. 21 & 24.

[93] Smith Decl. (2023), Exs. 21 & 24.  That Silber was the one reaching out to each lender controverts Plaintiff's allegation that it was AIC that lured an unsuspecting Silber into assuming the loans.  That is, of course on top of the fact there is no evidence it was AIC who approached Silber.

[94] Smith Decl. (2025), Ex. 3 (Russi Depo. 196:7-19).

Austin?" so Parmenter had to explain who he was.[95]

AIC responded to Silber's email summarizing its understanding of the tentative plan on December 17, 2020 but December 23, 2020 is the first time AIC provided any information directly to Silber when it emailed a spreadsheet to Silber and his attorney showing the balance for each Defendant Lenders' loan amount, property address, the note rate, and the loan priority.[96] In this email, AIC explained that it had no discretionary powers but could be a point of contact between Silber and Defendant Lenders for communication purposes.[97]

Silber asked AIC multiple questions specifically about construction reserve balances and loan priority, and AIC responded, providing the information requested, including about several accounts where Defendant Lenders or AIC had advanced funds to cover construction costs over and above the reserves to help get the projects completed.[98] Not once did AIC or Walker make any representation about the cost to complete construction, whether the construction reserve balances were sufficient, or what the anticipated sales value of the Properties was, nor were they asked for that information. It is clear from reviewing the discovery in this case that all that information was provided by Parmenter.[99] Parmenter testified that:

> A. Did we collect the data? Yeah, we collected some of the data and put it in the spreadsheet, as did Silber and his team.
>
> ***
>
> Q. What did Silber and his team do in connection with this document?
>
> A. They created a more robust spreadsheet with tabs at the bottom that we could

---

[95] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 167:3-16) & Ex. 8.

[96] Smith Decl. (2023), Ex. 25.

[97] Smith Decl. (2023), Ex. 25 at 2.

[98] Smith Decl. (2023), Ex. 28; *see also id.,* Ex. 24 at 4 (email from Asher Ehrman to Silber listing some reserve balances).

[99] *See, e.g.,* Smith Decl. (2023), Ex. 19 at 5- 19, Exs. 23 & 29. *Cf. id.,* Exs. 22 & 25. Smith Decl. (2025), Ex. 6 (ORJV Depo. 32:11-23, 68:5-13).

scroll through and -- and discuss easier.[100]

In January and February of 2021, Parmenter and Silber communicated more about loan balances, reserve balances, costs to compete, etc.[101]  Around the same time, Silber was emailing with another senior lien holder, Veristone, discussing assumptions of the Veristone-held loans per the plan between Russi and Silber.[102]  In the correspondence between Veristone and Silber, Silber states: "Profit in this deal? There are 100 homes here some win some loose [sic]. When you look at this globally it makes money[;] when you go based on a deal by deal basis things look different."[103]  Veristone says: "Perfect – then do you have a proforma[?]."[104]  Silber responds: "i would be nuts if i didn't."[105]  During the same time frame, Silber was having Riverside Abstract conduct lien searches on all Russi-owned properties.[106]

February 2021 is also when Plaintiff/Silber now admits: "Mr. Parmenter began acting as Oregon JV and Mr. Silber's agent no later than February 2021, when it became clear that Mr. Silber, through Oregon JV, would assume Joseph Russi's loan obligations on the Subject Properties to the Defendant Lenders."[107]  On February 1, 2021, Parmenter texted with Silber:

> Parmenter: It's interesting looking at all of the numbers…. some of these homes are going to be hard to quantify. Mostly due to craftsmanship.

---

[100] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 88:4-16).

[101] Smith Decl. (2023), Ex. 29.

[102] Smith Decl. (2023), Ex. 30.

[103] *Id.* at 3.

[104] *Id.* at 1.

[105] *Id.*

[106] Smith Decl. (2023), Ex. 34.

[107] Smith Decl. (2025), Ex. 5 at 3.  This contradicts the testimony in Silber's declaration where Silber testified under oath that: "At no time prior to entering into the Assumption Agreements was Parmenter employed, paid, or engaged to perform any activities on my behalf, Oregon JV, or any other entity which I was a member or controlled." Silber Decl., ¶ 11 (ECF Doc. No. 126).  This also contradicts the "Statement of Material Facts" in Plaintiff's Opposition to the MSJ: "Eventually, Plaintiff hired Parmenter and Parmenter's company, Oregon Real Estate Advisors, Inc., to complete construction on the Subject Properties. But again, prior to that time, Silber did not consider Parmenter to be his agent, and Parmenter had primarily been working on AIC's behalf." ECF Doc. No. 127, ¶ 19 (SOMF, citing to Silber's Declaration).

> Silber: What do you mean due to craftsmanship?
>
> Parmenter: quality of work.
>
> Parmenter: We will just have to go through and have a punch list crew take care of any [deficiencies] at the tail end of each project.[108]

Parmenter also disclosed to Silber (<u>but not anyone else</u>) that there were prospective buyers interested in Russi's properties.  On February 16, 2021, Parmenter texted Silber:

> Parmenter: Have 2 offers from investors for the whole portfolio.
>
> Silber: From who for what?
>
> Silber: And when you say whole portfolio. Including what
>
> Parmenter: Land and houses
>
> Parmenter: Everything
>
> Parmenter: <u>A **third** individual is asking how much we want.</u>
>
> Parmenter: For everything

***

> Parmenter:  Hi Jeremy, I have a very well qualified client that is interested in buying everything that MOB/Russi has left. Are you handling this? Can you send me the list of properties tomorrow and what it would take to acquire all of them? They have cash funds or will acquire financing for part of it. Happy Valentine's Day! Thanks, Mary
>
> Silber: Nah <u>we're not selling shit</u>. <u>We're</u> the next dr hortons serious competition.  Mark that down.[109]

None of this was communicated to Russi, who, at the time of these offers, had not yet executed the deeds transferring the Properties to Plaintiff:

> Q. Did you learn during the course of this case that Jeremy Parmenter had received strong interest from at least three other prospective buyers?
>
> A. I did not realize until just a few months ago from one of the realtors, yes, that

---

[108] Smith Decl. (2024), Ex. 8 at 2.
[109] Smith Decl. (2024), Ex. 20 (emphasis added).

couldn't believe I didn't take the $30,000,000 offer.[110]

On February 17, 2021, Silber and his team flew to Oregon to inspect the Properties and meet with Parmenter, Russi, and Duncan.[111]  They all met at MOB's headquarters in Roseburg and went over the financial picture for all Russi and First Phase-owned properties including all debts owed to subcontractors and suppliers, tax liens, loans, etc. as well as the costs associated with restarting construction.

> Q. Okay. When Mr. Silber and Ms. Fried were here in February of 2021 for the inspection did you discuss with Mr. Silber the fact that there were overages on the construction costs?
>
> A. Yes.
>
> Q. Okay.
>
> A. That's why I told him we needed 3 million immediately.[112]

Duncan showed Silber and his team the materials in the MOB warehouse and then they toured every room in all of the homes except for a few in outlying areas.[113]  Silber did not ask to see the homes that Parmenter alleged had workmanship issues.[114]  Silber did not hire a general contractor, home inspector, or design professional to inspect the Properties or to develop a cost to finish.[115]  Parmenter testified that some of the craftsmanship issues weren't visible but "if a home inspector had been hired for each and every house, which would have taken forever, I mean, that -- some of those things probably could have been found out."[116] Parmenter also

---

[110] Smith Decl. (2025), Ex. 3 (Russi Depo. 197:22-198:3). *See also* Russi Decl., ¶ 24.

[111] Smith Decl. (2023), Ex. 31 at 12.

[112] Smith Decl. (2025), Ex. 2 (Duncan Depo. 169:9-16); Duncan Decl., ¶ 6.

[113] Duncan Decl., ¶ 6; Smith Decl. (2025), Ex. 2 (Duncan Depo. 150:3-15).

[114] Smith Decl. (2025), Ex. 1 (Silber Depo. 212:25-213:3).

[115] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 56:5-14, 173:10-174:13, 178:23-179:20) & Ex. 1 (Silber Depo. 92:1-95:18, 106:21-108:4, 284:9-14).

[116] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 179:5-20).  *See also id.* 27:22-25, 50:12-17, 176:7-177:13.

testified that the status of construction was visible to Silber and his team for both the October

2020 and February 2021 inspections.[117] Russi testified the February 2021 inspection was

essentially a mirror image of what happened in October 2020.[118]

     Silber's assistant, Chaya (Ruth), took copious notes and photos of each home.[119] They all

discussed costs to complete each home and Parmenter provided estimated finished values for

each home they viewed.[120]  Silber indicated that he was willing to inject whatever capital was

necessary to complete the projects:

> My conversation with Mike was we needed $3 million immediately … He told
> me that he could write a check for 50 million. And I said, Well, we need 3 million
> right now, because not only do you have what's owed, but you have what's
> coming up.
>
> … It wasn't, like, hard numbers or anything off the computer or anything. That's
> just based on eight houses, what it cost to do eight houses a month. So I remember
> that conversation. I remember Mike saying, "From today forward no one talks to
> any of the investors" -- that that was his job, that he was going to show us how to
> make 5 million without any extra work.[121]

AIC had no knowledge about this trip at the time and has never met Silber in person.[122]

In fact, Silber had informed Duncan and Russi that they were prohibited from speaking with any

of the lenders and that he would handle all communications from that point forward:

> Well, Mr. Silber asked me to stay out of everything. Do not communicate with
> Austin Walker. Do not communicate with subordinate lenders. And if Mr.
> Parmenter found out that I did, the deal would be off.[123]

---

[117] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 362:13-17).  *See also* Smith Decl. (2025), Ex. 3 (Russi Depo. 161:14-162:8) ("You know, I know when they came down here during my bankruptcy we went to every single house, Asher, Ari, Jeremy, Dave Duncan, and myself, and they took hundreds of pictures. I mean, I would think they would have it, to be honest.") (responding to question about how many completed homes were transferred to Silber)).

[118] Smith Decl. (2025), Ex. 3 (Russi Depo. 200:22-201:25).

[119] Duncan Decl., ¶ 6.

[120] *Id.*; Smith Decl. (2025), Ex. 2 (Duncan Depo. 73:5-14).

[121] Smith Decl. (2025), Ex. 2 (Duncan Depo. 76:13-77:6, 151:5-16, 155:16-25).

[122] Walker Decl., ¶ 8; Smith Decl. (2025), Ex. 2 (Duncan Depo. 78:14-15, 189:12-18).

[123] Smith Decl. (2025), Ex. 3 (Russi Depo. 152:17-21, 216:5-20); Duncan Decl., ¶ 6; Smith Decl. (2025), Ex. 2 (Duncan Depo. 76:13-77:6, 155:5-12).

Silber did communicate with the lenders although he never asked AIC for any of the construction draw information or loan files.[124] Silber reached out to Gallic, the lender on the 38 acre parcel that was the property Silber made the effort to get title insurance on, and presented the same deal he did to AIC: waive default fees and interest in exchange for allowing the transfer of property and six months of interest up front.[125] Gallic informed Silber that there were other parties who were interested in the property and Silber later responded: "without the 38 acres this thing is a losing proposition."[126] A day later he says again, "I will need to know where you stand ASAP as I will not fund the bankruptcy dismissal if I dont have the 38 acres part of the deal otherwise its a loosing [sic] proposition for us."[127]

After the February 2021 inspection, Silber emailed an updated spreadsheet about the Russi portfolio to multiple people including: (a) Levi Ainsworth, (b) Elana@cthcare.com, (c) nachfried69@gmail.com, and (d) to Daniel Kugel at Mark J. Nussbaum LLP.[128] Nussbaum LLP was one of the originators of an interest payment to Defendants[129] but has since shut down apparently due to allegations that Mr. Nussbaum stole $15 million and gave it to Silber's business partner, Wolf Wercberger as "hush money."[130] Silber had to have different entities wire interest payments to AIC because Plaintiff never had a bank account.[131] This included a wire from Moshe Silber,[132] Silber's brother, who was recently sentenced to 30 months in federal

---

[124] Smith Decl. (2025), Ex. 1 (Silber Depo. 161:18-163:9, 219:3-7) & Ex. 4 (Parmenter Depo. 130:4-131:2).
[125] Smith Decl. (2023), Ex. 31 at 4.
[126] Smith Decl. (2023), Ex. 31 at 3.
[127] Smith Decl. (2023), Ex. 31 at 2.
[128] Smith Decl. (2023), Ex. 31 at 16-123 & Ex. 44.
[129] Walker Decl., Ex. 7.
[130] Smith Decl. (2025), Ex. 9.
[131] Smith Decl. (2025), Ex. 1 (Silber Depo. 242:8).
[132] Walker Decl., Ex. 7.

prison for his involvement in a multi-year, multi-million dollar mortgage fraud conspiracy.[133]

After the February 2021 inspection, Silber also emailed Walker stating that once he had pulled title reports, he found out that Russi had more debt than anticipated.[134] Defendants later discovered that this was likely a negotiation tactic because Parmenter and Russi had disclosed all known creditors and debt back in October 2020 to Silber and Parmenter and Silber had followed up directly with the subordinate lien holders individually in February 2021.[135]

It was at this point that Silber asked for Defendant Lenders to waive accrued interest and legal fees dating back to March 2020 in exchange for Silber paying six months of interest up front as well as guaranteeing certificates of occupancy for all vertical homes within six months which would allow the homes to be sold.[136] This was Silber teaching Duncan how to save millions – perhaps one of the only promises Silber followed through on:

> A. Mike said, "From this point forward I negotiate with all those people." And he said, "I'm going to show you how to save $5 million without any extra work."
>
> Q. Did he tell you what he meant by that?
>
> A. He said they were going to take a haircut. They were going to settle for less than what was owed.[137]

Over the course of the next month, the terms of the Assumption Agreements were reviewed by the parties, including Silber's business partner, Barry Farkas, while Silber tasked Parmenter, Duncan, and Russi with (a) having subcontractors go to the Properties and price the amount needed to complete their work, (b) obtaining pricing for work which had not yet started,

---

[133] Smith Decl. (2025), Ex. 17.
[134] Smith Decl. (2023), Ex. 31 at 11.
[135] Smith Decl. (2023), Exs. 26 & 32; Walker Decl., Ex. 5.
[136] Smith Decl. (2023), Ex. 31 at 11.
[137] Smith Decl. (2025), Ex. 2 (Duncan Depo. 155:5-12)

DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT - Page 31

and (c) providing a cash flow forecast.[138]  Silber testified that this was necessary because the cost to finish in the spreadsheets was a "speculative number, just a placeholder … I wanted actual pricing, subcontractor invoices, and to know true facts on the ground what it's actually going to cost me."[139]

Meanwhile, Riverside Abstract had only conducted lien searches, so Silber and a local attorney worked with title companies to insure the transfer of Russi properties to Silber once the bankruptcy was dismissed.[140]  Silber indicated to Riverside that he wanted to be protected because "A. I'm assuming debt B. Investing significant amounts of monies going forward."[141] One title company, Western Title, declined, saying they were unable to be involved in the transaction.[142]  The local attorney reached out to other title companies as well, stating in an email to First American: "I am preparing contract documents and deeds from Russi to Mike's LLCs. My understanding is they will 'probably' close outside of escrow. That said, receiving preliminary title reports on those properties would be very helpful, and I am sure Mike is going to want title insurance on those properties down the road."[143]  Parmenter testified that he would never advise someone to purchase 52 pieces of property without title insurance and having a title policy would be very high on his priority list in such a transaction.[144]

---

[138] Smith Decl. (2023), Ex. 33; *see also id.* at 6 (email from Silber about Assumption Agreement negotiations: "let's get this wrapped up… time is of the essence here.")

[139] Smith Decl. (2025), Ex. 1 (Silber Depo. 302:4-304:17).

[140] Smith Decl. (2023), Exs. 34 & 35; *see, e.g.*, Ex. 35 at 13 (email from Mornarich to First American: "I believe this to be a fairly complex and crazy transaction. My understanding is that without Mike Silber jumping in, then foreclosure is imminent and a lot of people will lose a lot of money. My dealings with Mike Silber indicate that one of his goals is to 'save' all these projects, which will help our local housing market and a lot of people that have expended funds. If my understanding is correct, then I am happy to be a part of this transaction.")

[141] Smith Decl. (2023), Ex. 34 at 8.

[142] Smith Decl. (2023), Ex. 35 at 1.

[143] *Id.* at 13.

[144] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 103:24 -104:11).

On March 15, 2021, Russi's bankruptcy was dismissed.[145]  On March 17, 2021,

Parmenter emailed Silber:

> I think we should move forward on these houses.  You wouldn't believe the call
> that I'm getting from realtors, home buyers and investors.  I would be willing to
> go on title and share liability with you somehow, mainly to put your mind at ease.
> Now that everyone knows that this thing is dismissed, there is a frenzy![146]

Shortly thereafter, ownership of the Properties was transferred by Russi and First Phase, LLC to

Plaintiff: "It literally was done, I think, the day I came out of bankruptcy or the day after because

he [Silber] -- my belief is -- was worried that I would find out about the other people that wanted

to buy the portfolio that they neglected to tell me about."[147]  Silber testified that he felt time was

an issue because if he did not assume the assets, other creditors or AIC could take the assets or

foreclose.[148]

Once again, Plaintiff and Silber flouted the ordinary processes and had Parmenter prepare

and record the deeds to the Properties without title insurance such that the deeds were executed

outside of title and without insurance.[149]  Silber obtained title insurance on some Russi-owned

property, but not the Properties at issue in this suit, despite knowing that "[i]f you plan to close

on your own, without the title company and with no title insurance, then you can close sooner

but with a LOT of risk."[150]  Silber testified that he felt rushed to move forward with the transfer

of the deeds and that he weighed the risk of not obtaining title insurance versus the risk of not

ending up with the Russi properties:  "Couldn't take the risk of not taking the deeds post-

---

[145] Smith Decl. (2023), Ex. 35 at 23.

[146] Smith Decl. (2025), Ex. 10.

[147] Smith Decl. (2025), Ex. 3 (Russi Depo. 153:14-19).

[148] Smith Decl. (2025), Ex. 1 (Silber Depo. 171:11-172:8).

[149] Smith Decl. (2023), Ex 36.  *See also id.* Ex. 35 at 15 ("Mike & Levi, Do you want Emily to immediately record the deeds from Russi regardless of having title insurance in place? Please advise ASAP."), Ex. 35 at 19.

[150] Smith Decl. (2023), Ex. 37.

bankruptcy. I would have had nothing. I would have had my loan, I would have had a hundred grand, and I would have had potentially AIC and/or any other creditors just start foreclosing and end up with nothing."[151] Ironically, ending up with nothing is what happened to Russi, because Silber never paid any of the amounts promised in the Transfer Agreement.[152]

On April 7, 2021, Silber executed all of the Assumption Agreements.[153] The Assumption Agreements are attached to the Complaint as Exhibit A (without the attachments referenced in the Assumption Agreements). The note amounts and the construction reserve balances are memorialized in the Assumption Agreements signed by Silber for Plaintiff. The totals show that there was $628,378.24 left in construction reserves for all of the Properties with 21 having a $0.00 reserve balance.[154]

Parmenter testified that:

Q. …Austin Walker and AIC never played a role in performing any due diligence or feasibility of these projects during the period of time that Mr. Silber was considering taking them over; correct?

A. Correct. [155]

Shortly after executing the Assumption Agreements, Silber changed the terms of the deal and stated he would now only pay three months of interest upfront and in 90 days, pay the other three months.[156] He mentioned the reasoning was the expense of starting a new construction company (Stone Creek), settling another VASE lawsuit, and mending relationships with the material suppliers Russi owed for past services completed and unpaid.[157] On April 23, 2021,

---

[151] Smith Decl. (2025), Ex. 1 (Silber Depo. 295:2-16).
[152] Smith Decl. (2025), Ex. 3 (Russi Depo. 207:1-211:5).
[153] Walker Decl., Ex. 6.
[154] Smith Decl. (2025), Ex. 11 (summary of AAs).
[155] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 84:3-7).
[156] Smith Decl. (2023), Ex. 38; Walker Decl., ¶ 9.
[157] Walker Decl., ¶ 9.

Walker emailed Silber all of the Assumption Agreements which had now been countersigned by Defendant Lenders.[158]  At the time Plaintiff took over, there were still a lot of building materials in the warehouse.[159]

Plaintiff and Silber hired Parmenter and his company, Stone Creek, to complete the construction on the Properties.[160]  Stone Creek was first licensed with the Oregon Construction Contractors Board on December 18, 2020.[161]  Starting in March of 2021, Stone Creek/Parmenter got the ball rolling on the permit transfer documentation to get the construction permits for the Properties transferred from Mid Oregon Builders to Stone Creek.[162]  In May of 2021, Parmenter emailed Silber and says: "I know you mentioned you wanted to prove to us that we could handle everything on the monetary side but I think we should draw from the reserves where we can" and Silber responds: "good point. I totally forgot about that."[163]  Also in May of 2021, VASE filed a fraudulent conveyance lawsuit against Russi, Plaintiff, Oregon JV1, LLC and Oregon JV2, LLC in relation to the March 2021 transfer of ownership of the Properties.[164]

When Plaintiff and Silber took over the projects, according to the Parmenter-Silber spreadsheets, there were at least 18 homes completed and 4 more which were in punchlist or finish status meaning only a few minor items needed to be wrapped up before they could be put on the market.[165]  However, Plaintiff and Silber could not sell the homes until the VASE issues

---

[158] Smith Decl. (2023), Ex. 39.
[159] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 410:22-411:2).
[160] Smith Decl. (2023), Ex. 40.
[161] Smith Decl. (2023), Ex. 5 at 5.
[162] Smith Decl. (2023), Ex. 40.
[163] Smith Decl. (2023), Ex. 42 at 4-5.
[164] Smith Decl. (2023), Ex. 41.
[165] Smith Decl. (2023), Ex. 44 (totals only account for homes where AIC is listed as the lender in the spreadsheet sent by Silber to real estate firm in NY after Silber's visit which shows status of each Property in column C, lender identified in column B).

were resolved.[166]  After the VASE lawsuit and judgment settled, Parmenter listed two of the properties for sale but once the offers were submitted to the title company, the First American underwriter conducted due diligence and asked for a copy of the Deed in Lieu agreement showing the consideration for the transfer of the Russi portfolio to Silber/TopRock.[167]

Unbeknownst to Defendants at the time, Silber or his agent(s) drafted a new agreement which Silber signed on or around September 2021.  This is evidenced by the fact that on May 13, 2021, Silber emailed the Transfer Agreement signed by Russi on December 9, 2020 to a Jeffrey Zwick with Levi Ainsworth on cc, calling it the "Post bankruptcy agreement which was completely met an hour apart regarding the monetary amounts owed under the agreement."[168] Silber had also emailed himself this "post bankruptcy agreement" on December 9, 2020.[169]

In September of 2021, Silber was pressed for the Deed in Lieu agreement "between Mike Silber (Toprock Funding) and Joe Russi under which the deeds to the Oregon JV were predicated" because First American's underwriter "would like to see that the agreement is absolute that Joe is not still considered an interested party or 'partner' in any way and will never receive payment or proceeds from any future transactions."[170]

Silber was in a pickle because the Transfer Agreement which Russi signed in December of 2020 provided for future payments of $87,500 each to Russi for every twenty houses issued certificates of occupancy, as well as 5% of sales for all houses built on the 38-acre parcel.[171]  At 3:17 pm on September 30, 2021, Silber's assistant, Chaya, emails him "scan0070" which is a

---

[166] Smith Decl. (2023), Ex. 45.

[167] Smith Decl. (2023), Exs. 46 & 47.

[168] Smith Decl. (2023), Ex. 48.

[169] Smith Decl. (2023), Ex. 48.  at 14-25.

[170] Smith Decl. (2023), Ex. 47 at 7.

[171] Smith Decl. (2023), Ex. 48 at 3; *see also* Smith Decl. (2023), Ex. 20 at 3 (same).

copy of a new "agreement for the transfer of real property" with Silber's signature only.[172]  Ten minutes later, the "Contracts Department" at TopRock sends Silber "scan0071" which is a reformatted version of the new agreement also signed by Silber.[173]  This version is what Silber emails to Parmenter one minute later saying: "Hey this is the agreement Joe should have."[174]

The next day, Mornarich provided a fully executed version of this new agreement with an effective date of March 1, 2021 (while Russi was still in bankruptcy) to First American.[175]  All of this was done to induce First American into underwriting the transfer of the Russi portfolio as a remediation effort.[176]  Ultimately, these efforts were unsuccessful due to the potential for a fraudulent conveyance claim from any Russi creditor arising out of the deeds from Russi to Silber being completed outside of escrow, without title insurance, as well as the fact that the new transfer agreement was vague.[177]  First American (October 5, 2021), and later ServiceLink (January 20, 2022), would not underwrite the sale of any of the homes.[178]

Perhaps another reason they could not sell homes is the tactics used by Parmenter and Silber.  On November 15-16, 2021, the following text exchange occurred between Parmenter, Silber, and Silber's assistant, Ruth/Chaya Fried.

> Parmenter: $300,000 offer on 492 Fairway[.]  They have an escalation clause in the offer but the escalation clause is not engaged if we don't have another offer higher than their base offer.
>
> Silber: So how does that work
>
> Silber: How Do we get them upto 350k?

---

[172] Smith Decl. (2023), Ex. 49 at 1-8.

[173] Smith Decl. (2023), Ex. 49 at 9-20.

[174] Smith Decl. (2023), Ex. 49 at 21-32.  *See also id.* at 33 (email from Russi to Silber on September 14, 2021 outlining the payment terms of their "Agreement").

[175] Smith Decl. (2023), Ex. 50.

[176] *Id.*

[177] Smith Decl. (2023), Ex. 51.

[178] *Id.*

\*\*\*

Parmenter: The escalation clause is an engaged unless we have another offer that's higher than their offer to push it up that high. …

Silber: Ruth do u wanna buy a house?

\*\*\*

Parmenter: Do we want to move forward on 492 Fairway?

Silber: Did you send Ruth a offer sheet?

Silber: ??

Parmenter: Do you want me to? ??

Silber: Fuck ya for 50k

Parmenter: Liked "Fuck ya for 50k "

Parmenter: Ruth Fried?

Silber: Yes sir

Parmenter: Ok

\*\*\*

Ruth: Hi Jeremy good morning. I saw your listing for 492 fairway. It's a beautiful house, I've done the virtual tour and it's something I'm highly interested in. Is anyone in contract yet? I'd like to put in an offer for 339k is that something that can be done?

Parmenter: Absolutely!

Ruth: Do I need to put in a formal offer?

Parmenter: We will get one written up ASAP!

\*\*\*

Silber: Any word on fairway buyer?

Parmenter: Think we scared them away.[179]

---

[179] Smith Decl. (2025), Ex. 12 (ORJV057944-50).

The Assumption Agreements were amended in November of 2021 at Silber's request to purportedly allow more time to transfer the building permits and complete the construction because the original agreements required certificates of occupancy within six months.[180] Plaintiff made no mention of any issues with the original construction or workmanship at this time. "The only time that -- any complaints started coming up is when they couldn't sell because of title."[181] Parmenter testified that there were a lot of buyers interested in the homes that had been completed but the inability to obtain title insurance prevented the homes from selling.[182] Silber admitted this as well:

> Q. Why didn't you use a title company in closing the purchase from Mr. Russi?
>
> A. There was no time.
>
> Q. So is that a risk?
>
> A. Absolutely.
>
> Q. What kind of risk did it present not closing the acquisition to a title company?
>
> A. What type of risk?
>
> Q. Uh-huh.
>
> A. Couldn't sell the properties.
>
> Q. And you couldn't sell the properties ultimately in this project, could you?
>
> A. That's what I'm saying.
>
> * * *
>
> Q. Okay. What were the title issues that you encountered after acquiring and trying to list the properties for sale?
>
> A. No insurance companies were willing to insure.[183]

---

[180] Smith Decl. (2023), Ex. 43; *see also* "Addendums" included in Exhibit A to the Complaint (showing Silber signed them on November 16, 2021 although they are dated October 1, 2021).

[181] Smith Decl. (2025), Ex. 3 (Russi Depo. 215:20-216:3)

[182] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 67:2-68:3).

[183] Smith Decl. (2025), Ex. 1 (Silber Depo. 121:23-123:13). *See also id.* at 146:2-6 ("But for the question of your

The title issues had nothing to do with AIC, Walker, or any other Defendant.[184]  Silber also

clarified that although the VASE judgment affected title, the fact that title to the Russi properties

did not transfer to Plaintiff using a title company was the main cause of the title issues.[185]

Plaintiff and Silber stopped paying interest on the loans in January of 2022 and also

stopped paying for fire insurance, taxes and utilities at the Properties.[186]  On February 1, 2022,

demand letters were sent to Plaintiff and Silber explaining that if they did not cure the defaults,

Defendant Lenders may elect to proceed with foreclosure.[187]  Around this time is also when what

little construction Plaintiff and Silber were having Stone Creek perform ceased and Plaintiff

apparently stopped paying everyone else.[188]

Although AIC was not involved in developing or providing the cost to finish in any way,

it should be noted that both Parmenter and Duncan both testified that there were a lot of variables

in play and so the cost to finish changed significantly over time.  These variables included: (1)

the cost to build estimate that was prepared by Duncan was initially done when MOB was

obtaining the loans and took into consideration the loan to value ratio and Russi's tendency to

---

client, of AIC, yes, I intended to assume them and pay them off in full, but unfortunately, there were -- I was
destined for complete failure given that I couldn't sell the properties.")

[184] *See* Smith Decl. (2025), Ex. 1 (Silber Depo. 233:4-234:6) (explaining the title reports were inaccurate and he was
later surprised by other encumbrances that came up on the Properties and admitted those had nothing to do with
AIC).

[185] *See* Smith Decl. (2025), Ex. 1 (Silber Depo. 274:22-275:16).

[186] Smith Decl. (2023), Ex. 52; Walker Decl., ¶ 10 & Ex. 4.

[187] Walker Decl., Ex. 4.

[188] *See, e.g.,* Smith Decl. (2023), Ex. 52 at 4 (January 21, 2022 email from Silber: "we are stopping construction
effective immediately") & Ex. 52 at 9 (February 1, 2022 email from Parmenter to Silber "I know that we stopped
construction but many of the people that haven't been paid simply won't do business with me if I don't take care of
them. … Total comes to $273,000").  *See also* Smith Decl. (2023), Ex. 53 at 2 (February 4, 2022 email from
Parmenter to Silber: "Tomorrow I am going to sell the truck and Dump trailer to try and pay off some of the past due
debts that Stone Creek Building & Construction has acquired on the AIC homes that are now exceeding $300,000.
This seems like it could be a simple solution but it has not been resolved and seems that it falls on deaf ears.
Frankly, I am tired of chasing you. … I was notified that the BuildersRisk policy on all of the homes is now
cancelled after countless attempts to try and get it paid. The workers comp is also cancelled…").

contribute capital (which he no longer had), (2) Stone Creek did not have full in-house crew like

MOB had; an in-house crew was significantly cheaper, (3) Parmenter believed Duncan

miscalculated some overhead costs like payroll taxes, (4) COVID increased material costs

significantly and affected the supply chain (so timing), (5) Parmenter was inexperienced and

redid or undid work needlessly, such as tearing roofs off the houses in Glide, and the siding in

Divot and in Forest Heights, leaving them exposed to the weather, and replacing the already

installed granite countertops with quartz.[189]

One issue raised by Plaintiff in its Opposition to the first MSJ was that there were

allegedly latent construction defects at the Properties.  On February 22, 2022, Parmenter entered

into a Purchase and Sale Agreement for Safari Estates, another Russi subdivision where the

lender (Veristone) foreclosed so title was cleared.[190]  Plaintiff may again rely on Parmenter

mentioning workmanship issues, including at Safari Estates, but if the workmanship was so bad,

why would Parmenter offer to spend $3.45 million to buy it?  Further, even if there were latent

defects, how would AIC know that? AIC visited the Properties in relation to construction draws

but would not be able to observe <u>latent</u> defects. Parmenter also testified:

> Q. Mr. Walker and AIC never made any representations to you or anybody
> involved in these inspections regarding the nature of construction or the quality of
> construction, did they?
>
> A. No.  No.[191]

Plaintiff filed this lawsuit in March of 2022.  On March 16, 2022, Parmenter emailed AIC

and others, explaining his disagreement about the lawsuit being filed and stating that he is no

---

[189] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 142:7-143:8), Ex. 2 (Duncan Depo. 32:3-34:9, 43:3-19, 131:24-132:5, 158:21-159:15, 160:15-161:21, 164:1-165:10, 166:11-168:23, 176:20-23, 195:2-3 ("I told you over and over that the budget to build had nothing to do with the loan amount.")) & Ex. 3 (Russi Depo. 120:15-20, 133:11-21, 135:7-12).

[190] Smith Decl. (2025), Ex. 13.

[191] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 59:24-25).

longer involved with Plaintiff/Silber:

> **I don't agree with the course of action that has been taken by Oregon JV LLC** and I am extremely disappointed with the way everything has transpired. I have done everything in my power to diffuse the situation, but unfortunately was unsuccessful. After nearly 3 years of working for free, **I don't have the energy to continue on, nor do I care to be part of a <u>frivolous lawsuit</u>**! I want to make it perfectly clear that I **did not and do not condone this type of business practices**.[192]

Despite his desire to part ways with Plaintiff/Silber, Parmenter remained involved in some capacity, working on mending relationships with subcontractors and people left by Plaintiff and Silber who'd walked away and stopped paying bills.[193]  In May of 2022, Parmenter instructed subcontractors to remove materials from the Properties in lieu of payment.[194]  Also in May of 2022, the building permits expired.[195]  In July of 2022, the City of Roseburg issued derelict building notices.[196]

On August 24, 2022, Parmenter sent Silber an email summing up the consequences of Silber's business practices:

> This has been a painful process for all involved. I hated to cut ties but the reality is that I can't be in business with someone that is going to leave me hanging. I was hired as an employee and not a partner. I worked for free for a long time and even when I was being paid, I usually had to use that money to bridge the things that weren't getting paid timely or that were unforeseen.
>                                    ***
> You will never know the damage that has been caused from a reputation standpoint in this community. I've said this to you countless times but I don't think it registers with you. This is not New York, this is a very small community and word travels fast. As of right now, people don't see that Mike Silber owned these properties, it looks like Jeremy Parmenter owns these properties and that Stone Creek B&C doesn't pay their bills.

---

[192] Smith Decl. (2023), Ex. 54 (emphasis added).

[193] Smith Decl. (2023), Exs. 52 & 53.

[194] Smith Decl. (2023), Ex. 52 at 22.

[195] Smith Decl. (2023), Ex. 52 at 20-21, 24-25 (emails between Parmenter and building officials; in the latter he states: "We are still owed $200,000 by Oregon JV … I just want to make it perfectly clear that we do not have a relationship with any of these principals.").

[196] Smith Decl. (2023), Ex. 52 at 26-32.

DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT - Page 42

> On another note, **I can't say that this lawsuit is bringing any good to this
> entire situation**. I feel like Joseph is three steps behind these guys and I
> personally believe this case is over everybody's head because it's so complicated.
> Patrick Carney has already successfully foreclosed out Forest Heights and they
> are in process of making a deal with a local developer in the area. It appears that
> several others will be going to Auction in September too. With all of the juniors
> initiating foreclosure, it doesn't seem like there is a move here.[197]

Parmenter testified in his November 7, 2024 deposition that he is still paying

subcontractors who worked on these Properties on behalf of Plaintiff nearly three years

after Plaintiff/Silber abandoned them.[198]

## E.    ARGUMENT

This lawsuit is meritless and was only filed to stop Defendant Lenders from foreclosing

on the Properties nonjudicially.  There is absolutely no evidence to support any of the claims and

summary judgment is warranted.  To the extent summary judgment is not granted in full,

Defendants request that the Court enter an order allowing Defendants to foreclose nonjudicially

so they can sell the Properties and mitigate their damages.

### 1.    First Claim for Relief: Fraud in the Inducement/Promissory Fraud

"The type of interest protected by the law of deceit is the interest in formulating business

judgments without being misled by others—in short, in not being cheated." *Riley Hill Gen.*

*Contractor, Inc. v. Tandy Corp.*, 303 Or. 390, 407, 737 P.2d 595 (1987). There are no facts here

which show Plaintiff was misled or cheated by Defendants in any way.  Defendants provided all

requested information and all information was accurate.  Plaintiff cannot prove otherwise.

In order to prevail on a fraud claim, Oregon law requires that the plaintiff prove: "the

defendant made a material misrepresentation that was false; the defendant did so knowing that

---

[197] Smith Decl. (2023), Ex. 55 (emphasis added).
[198] Smith Decl. (2025), Ex. 4 (Parmenter Depo. 66:1-9).

DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT - Page 43

the representation was false; the defendant intended the plaintiff to rely on the misrepresentation; the plaintiff justifiably relied on the misrepresentation; and the plaintiff was damaged as a result of that reliance." *Strawn v. Farmers Ins. Co. of Oregon*, 350 Or. 336, 352, 258 P.3d 1199 (2011).

If the fraud causes someone to enter into a contract, that can be called fraud in the inducement or promissory fraud: "Implicit in the element of reliance is a requirement the plaintiff prove a causal relationship between the representation and his entry into the bargain. In other words if he fails to prove that the fraudulent misrepresentations induced him to make the agreement he has failed to establish the element of reliance." *Gardner v. Meiling*, 280 Or. 665, 671, 572 P.2d 1012, 1015-16 (1977). *See also Cocchiara v. Lithia Motors, Inc.*, 353 Or. 282, 291, 297 P.3d 1277, 1283 (2013) ("Oregon has adopted the Restatement formulation of promissory estoppel: 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.'")

The party alleging fraud has the burden of proving each of the elements and failure to prove any one or more of the elements is fatal to the cause of action. *See Conzelmann v. N. W. P. & D. Prod. Co.,* 190 Or. 332, 350, 225 P.2d 757, 765 (1950) (citing 37 C.J.S. Fraud, § 94). The burden of proof for a fraud claim is clear and convincing evidence. *Riley Hill Gen. Contractor, Inc. v. Tandy Corp.*, 303 Or. 390, 402, 737 P.2d 595 (1987); *OPERB v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 423–24, 83 P.3d 350 (2004).

In this case, Plaintiff alleges that Defendants intentionally induced Plaintiff into entering into the Assumption Agreements by misrepresenting the nature and status of the construction

loans which were being assumed by Plaintiff.[199]  These alleged misrepresentations were: "(i) the

construction at the Properties constituted an economically viable project, (ii) that the [remaining

loan funds for each property were] sufficient to complete construction of the projects without the

need for significant additional capital infusions, and (iii) that AIC had been properly managing

the [individual loans]."[200] Plaintiff cannot show any genuine issue for the jury on any element of

this claim. Plaintiff/ Silber, experienced real estate investors, entered into the Assumption

Agreements after conducting extensive due diligence and knowing (and admitting in writing)

that they would need to invest significant capital to complete construction.  Defendants made no

misrepresentations and summary judgment is warranted.

     **(a)**    ***Defendants Made no Misrepresentations***

      The evidence clearly shows that Defendants did not make any misrepresentations to

Plaintiff.  Defendants made no representations <u>at all</u> about the economic viability of the projects

or that the remaining loan funds were sufficient.  All of the information requested by

Plaintiff/Silber was disclosed to it by Defendants.  Defendants expressed no opinions about the

project either.  *See, e.g., Gillett v. Tucker*, 317 Or. App. 570, 580, 507 P.3d 323 (2022) ("As a

general rule, 'statements of opinion are not actionable, even though false.'  However,

expressions of opinion may be considered misrepresentations of fact but only when the parties

are 'on unequal footing and do not have equal knowledge or means of knowledge.'") (internal

citations omitted).  The only representations made about the economic viability of the project or

sufficiency of loan funds came directly from Parmenter based on the spreadsheet he/his office

created which Plaintiff and its associates revamped multiple times.[201]  There is no evidence that

---

[199] Second Amended Complaint, ¶¶ 83, 90.
[200] Second Amended Complaint, ¶¶ 84, 90.
[201] *See* Smith Decl. (2023), Ex. 19 at 5-19, Ex. 23, Ex. 29.

Parmenter's was acting as an agent for Defendants when he helped Silber complete due diligence for the assumption of the Russi portfolio over the course of at least six months.

Even if Defendants' factual and accurate statements about the loan balances and reserve balances could be considered opinions as to the economic viability of the project or sufficiency of loan funds, the parties were on equal footing and Silber is an experienced businessperson who regularly invests in real estate.[202]

> Menachem Silber, co-founder of Lightstone Management, has led the development of over 1,000 affordable housing units throughout NYC, demonstrating a commitment to community growth and value, with projects valued at over $500 million and expansion into diverse markets.

> With a diverse portfolio exceeding $500 million in real estate and investments in emerging sectors, Lightstone's innovative approach aims to deliver exceptional results and sustainable housing solutions for families across various communities.[203]

As the Oregon Court of Appeals held in the *Frank v. Fitz Enterprises* case, a statement about a potential, specific outcome cannot be actionable fraud unless the parties are on unequal footing. 106 Or. App. 183, 186, 806 P.2d 720 (1991). In *Frank*, the lessor of a gas station sued Fitz Enterprises for fraud because the president of Fitz had expressed the opinion that the gas station would sell a minimum of 15,000 gallons a month. *Id*. The Court found that Frank was an experienced businessperson who had initiated the negotiations and could have conducted a market analysis to determine potential sales. *Id*. at 186-87. In other words, the parties were on

---

[202] *See, e.g.,* Smith Decl. (2023), Ex. 51 at 5 (email from Parmenter: "I also wanted to introduce my business partners Menachem Silber of New York and Asher Ehrman of California. **Collectively these gentlemen own over 25,000 multifamily units nationwide** and own a large Real Estate Fund with a focus primarily on Multifamily. … we have several other land acquisitions in motion and will be building north of 1000 homes in Oregon alone, over the next 24 months.") (emphasis added). *See also id.,* Ex. 4 at 10 (BFMS website: "to date [Lightstone] has developed 3,000+ units in NYC with a combined value of over $500 Million dollars. Over time the business has expanded to focus on out of state opportunities as well. Lightstone currently has over $1B in active development projects across multiple states including Oregon, Tennessee, Florida, Michigan, Wisconsin and New York. Lightstone currently owns 1300+ units in New York and 2000+ units outside of New York state.").

[203] Smith Decl. (2025), Ex. 14.

equal footing with equal knowledge or means of obtaining knowledge. *Id.* at 186. That is the very case here and like the Court in *Frank*, this Court should find Plaintiff's claim for fraud not actionable.

Plaintiff cannot show that Defendants made any misrepresentations, let alone any material misrepresentations and without that, Plaintiff's claim for fraud/promissory inducement, fails.

### (b)    *There was no Falsity or Knowledge Thereof*

The second element of a fraud claim is that the defendant made the material misrepresentations knowing that they were false. The only representations made by Defendants, to the extent they can even be qualified as "representations," were true statements about the lender's name, loan balance, reserve balance, interest rate, maturity date, location, and priority. These are simply facts and there is no evidence these were untrue, nor is there evidence that Defendants knew they were untrue (because they were not).

### (c)    *There was no Intent on the Part of Defendants*

Because there were no misrepresentations, there was no intent on behalf of Defendants that Plaintiff rely on misrepresentations and Plaintiff cannot prove otherwise, especially by clear and convincing evidence. In fact, on the day of Silber's first contact with AIC, DW&S had submitted a stipulated order to the bankruptcy court granting relief from the bankruptcy stay to foreclose on 23 of the Properties.[204] Defendants could have moved forward with foreclosures had Silber and Plaintiff not asked to assume the Loans and stop that from happening. The evidence shows that Defendants provided factual, accurate information and Plaintiff made a business choice to assume the Loans. It should also be noted that it was not Defendants who

---

[204] Smith Decl. (2023), Ex. 18 at 5.

"solicited" Plaintiff but the other way around – Silber was the one emailing <u>all the lenders</u> about taking over Russi's properties.

      **(d)**    ***No Justifiable Reliance***

The fourth element, the plaintiff justifiably relied on the misrepresentation, also cannot be proven because there were no misrepresentations. To the extent that the factual information about the loan balances and construction reserve balances constitute representations about the economic viability of the project or proper management of the loans, Plaintiff will need to prove that those representations were not only materially wrong, but that it justifiably relied on them when assuming the loans. *See Gardner v. Meiling*, 280 Or. 665, 671, 572 P.2d 1012 (1977) ("Implicit in the element of reliance is a requirement the plaintiff prove a causal relationship between the representation and his entry into the bargain.").

"The requirement that a plaintiff's reliance be justified serves as a balance between, on the one hand, the policy that a person who intentionally deceives another should not be allowed to profit from the deception and, on the other hand, the recognition that the person deceived, as an autonomous individual, should be responsible for protecting his or her own interests when making a decision. Consequently, to satisfy the element, a plaintiff must have exercised reasonable diligence, in the totality of the circumstances, to assess the truth of the allegedly fraudulent statements before acting in reliance on them." *Murphy v. Allstate Ins. Co*., 251 Or. App. 316, 324, 284 P.3d 524 (2012). *See also OPERB v. Simat, Helliesen & Eichner*, 191 Or. App. 408, 428, 83 P.3d 350 (2004) (Whether reliance on an alleged misrepresentation is justifiable turns on "the totality of the parties' circumstances and conduct.").

There are two circumstances on which Oregon courts have focused to make the determination about whether a plaintiff's reliance is justifiable (1) "the ability of the plaintiff to obtain information that would reveal the truth of the fraudulent statement—that is, the difficulty

that a plaintiff would encounter in conducting an independent investigation of the truthfulness of the statement;" and (2) "the relative sophistication of the parties—that is, whether the parties are equally capable of evaluating certain facts about the statements." *Murphy v. Allstate Ins. Co.*, 251 Or. App. 316, 325, 284 P.3d 524 (2012).

As to the first circumstance, Plaintiff physically viewed the Properties via its principal, Silber, as well as through representatives sent by Silber. Plaintiff could see for itself how much work was remaining on each Property and how much money was left to complete that work. There is no information Defendants had that Plaintiff did not. Prior to executing the Assumption Agreements, Plaintiff conducted a thorough vetting of Russi and his holdings and debts and was provided with all the relevant Loan figures including construction reserve balances.

Plaintiff also performed extensive internal due diligence with several of his professional confidants, Ari Stock and Asher Ehrman aka Jason Phillips with Teal Funding, visiting the Properties and putting together debt sheets and costs to finish for the project, and having Ari Stock and Asher Ehrman engage with a title company (Riverside Abstract) with which Silber had prior working relationship to review Russi's properties to clearly understand all underlying debt.[205]

Early on, Silber, via Asher Ehrman, states in a November 4, 2020 email: "[a]fter all construction is done and everything finished we were looking at about 22M total out of pocket."[206] In March of 2021, when Riverside Abstract referred Silber to Western Title, Silber's attorney, Levi Ainsworth, clarifies that the deal involved his client assuming about $30 million in debt.[207] Silber responds to the email and says: "to clarify further it's a combination of debt

---

[205] *See, e.g.*, Smith Decl. (2023), Exs. 19 & 34, 44.
[206] Smith Decl. (2023), Ex. 19 at 22.
[207] Smith Decl. (2023), Ex. 35 at 3.

assumption and what I feel I'll be putting into these properties to bring them to completion which of course we want to protect."[208]  In other words, Silber knew full well he'd need to invest a significant amount of capital into the Properties to complete them and conducted full due diligence before signing the Assumption Agreements.[209]

As to the second circumstance, Silber held himself out as an experienced real estate tycoon and businessperson.[210]  He was perfectly capable of evaluating the facts and made the decision to enter into the Assumption Agreements, knowing the projects were distressed and that Russi had filed bankruptcy.  *See Vukanovich v. Kine,* 268 Or. App. 623, 634-35, 342 P.3d 1075, 1083 (2015) ("Among other things, for reliance to be justifiable, the party claiming reliance must have taken 'reasonable precautions to safeguard [his or her] own interests' under the particular circumstances of the case. What precautions a person must take to protect his or her own interests turns on the nature of the person's relationship with the person making the alleged misrepresentation, and that person's experience and sophistication with the type of transaction at issue, as well as with the subject matter of the misrepresentation.") (internal citations omitted). Plaintiff cannot show that it justifiably relied on any representations made by Defendants, if they can even be qualified as such.

###    (e)    *Plaintiff Has Not Been Damaged*

Plaintiff cannot claim it was damaged by misrepresentations because Defendants made none, especially as to the economic viability of the Project, etc., as alleged by Plaintiff.  Any damage Plaintiff has suffered has been because Silber did not obtain title insurance on the

---

[208] *Id.*

[209] *See* Smith Decl. (2023), Ex. 4 at 11 (BFMS website: "Our Process" involves "Purchase: After much due diligence, a property is purchased;" "Renovate: we use the best contractors, many whom we have worked with for years, to bring our vision to life.").

[210] *See, e.g.,* Smith Decl. (2023), Ex. 51 at 5, Ex. 4 at 9-14.

Properties or go through the standard escrow process such that no title company would work with him. And when trying, Silber had Russi sign a new agreement to address the title company's concern about Russi's continued involvement in the Project but that did not work. Further, Plaintiff cannot prove it paid anything because it doesn't even have a bank account.

Plaintiff cannot prove that a jury would find for it on any element of the fraud claim, let alone each and every one of them which is what is required by clear and convincing evidence. Summary judgment on Plaintiff's first claim for relief is warranted.

### 2.    Second Claim for Relief: Unjust Enrichment

In its second claim for relief, Plaintiff alleges that it was fraudulently, negligently, or innocently induced by Defendants into signing the Assumption Agreements and that it conferred a benefit on Defendant Lenders by paying interest on the Loans and spending money on construction – both of which it promised to do under the terms of the Assumption Agreements. "Under the quantum meruit theory of an obligation implied in law, in the absence of an express contract governing the subject matter, an obligation to pay is implied to prevent unjust enrichment by one party." *Kizer Excavating Co. v. Stout Bldg. Contractors, LLC*, 324 Or. App. 211, 218, 525 P.3d 883 (2023) (a "claim pleading an 'implied-in-law' theory of quantum meruit states 'a claim in restitution rather than contract.'") (citations omitted). *See also Jaqua v. Nike, Inc.*, 125 Or. App. 294, 298, 865 P.2d 442 (1993) (Unjust enrichment is a quasi-contractual claim which is "a remedial device to accomplish substantial justice by preventing unjust enrichment.") (citations omitted). Thus, unjust enrichment is an equitable doctrine. *Wilson v. Gutierrez*, 261 Or. App. 410, 411, 323 P.3d 974 (2014); *see also Speciality Risk Servs. v. Royal Indem. Co.,* 213 Or. App. 620, 625, 164 P.3d 300 (2007) ("Restitution for unjust enrichment is a venerable claim for relief sounding in equity, the underlying principles of which date back to Roman law and the Digest of Justinian.").

In evaluating the viability of an unjust enrichment claim, "courts should examine the established legal categories of unjust enrichment as reflected in Oregon case law and other authorities to determine whether any particular enrichment is unjust." *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 132, 404 P.3d 912 (2017) (identifying Oregon Restatement (Third) of Restitution and Unjust Enrichment as one of the "proper authorities" to examine).

Plaintiff's claim fails because: (a) there are valid and enforceable contracts in place which displace any unjust enrichment claim, (b) there is no reasonable basis for the claim as set forth *supra* in relation to the fraud claim, (c) Defendants have not, in fact, been unjustly enriched, and (d) this is an equitable claim which cannot be entertained by a federal court if any of the legal claims remain after motion practice.  If the Court does not dismiss this claim on summary judgment, Defendants request that the Court grant partial summary judgment on the relief sought on the claim to permit Defendants to proceed with nonjudicial foreclosure and mitigate their damages.

### (a)    *There are Valid and Enforceable Contracts in Place that Displace this Claim*

If it is determined that enforceable contracts exist, those contracts will control and will displace any unjust enrichment claim because there "cannot be a valid legally enforceable contract and an implied contract covering the same services." *Kashmir v. Patterson*, 43 Or. App. 45, 48, 602 P.2d 294 (1979). Plaintiff has attached those contracts to its Complaint.  In *Gillett v. Tucker*, the plaintiffs sued the defendants for breach of contract, fraud in the inducement, and unjust enrichment.  317 Or. App. 570, 582, 507 P.3d 323 (2022).  Similar to the allegations here, the plaintiffs in *Gillett* alleged that they had been induced into entering into a lease agreement with an option to purchase because the defendants had told them it would be a profitable arrangement.  *Id.* at 579.  The plaintiffs also sought reimbursement for monies expended under

the terms of the lease because that money was supposed to go towards the purchase price if they exercised their option to purchase, which ultimately, they didn't. *Id.* at 581.

Citing to the *Larisa* case and the Restatement, the Oregon Court of Appeals held that the trial court erred when determining the plaintiffs could prevail on their unjust enrichment claim because there was a valid, enforceable contract in place. *Id.* at 581-82 ("[a] valid contract [that] defines the obligations of the parties as to matters within its scope, displac[es] to that extent any inquiry into unjust enrichment.") (quoting Restatement (Third) of Restitution and Unjust Enrichment (2011) § 2). *See also id.* ("Restitution is accordingly subordinate to contract as an organizing principle of private relationships, and the terms of an enforceable agreement normally displace any claim of unjust enrichment within their reach."); *Porter Constr. Co. v. Berry*, 136 Or. 80, 84-85, 298 P. 179 (1931) (noting "that there can be no implied contract where there is an express contract between the parties in reference to the subject-matter"); *Mt. Hood Community College v. Federal Ins. Co.*, 199 Or. App. 146, 158, 111 P.3d 752 (2005) ("It is well established that there cannot be a valid, legally enforceable contract and an implied contract covering the same conduct.").

Here, Plaintiff is seeking restitution of interest and construction costs which it paid pursuant to the terms of the Assumption Agreements, i.e., the Assumption Agreements reference the subject matter and therefore, Plaintiff cannot pursue its unjust enrichment claim. Of course, Plaintiff's contention appears to be that the contract should be invalidated because it was procured by fraud, negligence, or innocent mistake. *See, e.g.,* First Amended Complaint, ¶ ¶ 88, 94 (seeking recission under the fraud claim), ¶103-104 (alleging inducement as basis of unjust enrichment claim), etc. To the extent the Court finds that there was no fraud or other reason to invalidate the Assumption Agreements, this claim should be dismissed as a matter of law on the

grounds that there are valid and enforceable contracts that govern the relationship between the parties under which Plaintiff promised to pay interest and complete construction.

      **(b)**     ***There is no Reasonable Basis for the Claim***

Additionally, similar to the fatal defects with the fraud claim, Plaintiff cannot prove conduct by Defendants which could be considered false or fraudulent such that Plaintiff can prevail on its unjust enrichment claim under one of the recognized categories of unjust enrichment. *See Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115, 135, 404 P.3d 912 (2017) ("both the Restatement (3d) Restitution and our case law are in accord that a person—and his or her estate—have been unjustly enriched if the person obtains benefits by making false representations about his or her financial state.") When a transfer of money is induced by fraud or material misrepresentation, the transfer can be subject to recission and the transferee can be "liable in restitution as necessary to avoid unjust enrichment." *Id*. at 133. For the same reasons the fraud claim should be dismissed on summary judgment, so too should the unjust enrichment claim.

      **(c)**     ***Defendants Have Not, in Fact, Been Unjustly Enriched***

Practically speaking, this claim is particularly overreaching because Plaintiff hasn't paid interest on the Loans since December of 2021, made very minimal progress on the construction, never received occupancy on a single home and Defendants have had to pay for insurance, taxes, and utilities on the Properties, meaning they have not been enriched at all, let alone unjustly. The parties entered into a business deal and Plaintiff had full disclosure on the status of the Loans, the condition of the Properties, etc. Plaintiff defaulted on the terms of the Assumption Agreements to the detriment of Defendants. It is Plaintiff who has been unjustly enriched, not Defendants.

      **(d)**     ***This is a Claim for Equitable Relief***

Finally, federal courts are precluded from awarding equitable relief when an adequate

legal remedy exists. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841-42 (9th Cir.

2020). To the extent this Court denies summary judgment against any of Plaintiff's legal claims,

summary judgment on the unjust enrichment claim should be granted.

### 3.    Fourth Claim for Relief: Recission based upon Mutual Mistake of Fact

Plaintiff alleges that there were mutual mistakes of fact about the construction reserve

balances and that those mistakes frustrated its purpose of making money on the project.[211]

Plaintiff seeks a slew of damages and remedies including rescission of the Assumption

Agreements, $10 million in "construction costs," interest, attorney fees, etc. despite the fact they

had full disclosure of all relevant facts and entered into the contracts with eyes wide open.  As

the Oregon Supreme Court has stated: "Equity will not relieve a party of an improvident bargain

simply because his opinion of its value proves incorrect."  *Gardner v. Meiling*, 280 Or. 665, 675,

572 P.2d 1012 (1977).  So too should this Court refuse to relieve Plaintiff of its obligations under

the Assumption Agreements simply because it alleges that it did not make as much money as it

thought it would when assuming loans on a distressed project from someone who'd filed for

bankruptcy.  Summary judgment on this claim is warranted.

Under the doctrine of mutual mistake, a contract is voidable "where the parties are

mistaken as to the facts existing at the time of the contract, if the mistake is so fundamental that

it frustrates the purpose of the contract . . . and where the adversely affected party does not bear

the risk of the mistake."  *Lesher v. Strid*, 165 Or App 34, 42, 996 P.2d 988 (2000).  A mistake "is

a state of mind which is not in accord with the facts."  *Ellison v. Watson*, 53 Or. App. 923, 927,

633 P.2d 840 (1981). The facts concerning the amount of money left in the construction reserves

---

[211] Second Amended Complaint, ¶ 123.

for each loan was disclosed in the Assumption Agreements.  That Plaintiff now alleges that there was not enough money to complete construction is not a risk that Defendants should bear, especially given the amount of due diligence that Plaintiff conducted before assuming the loans and that Plaintiff specifically stated it would have to invest $22 million of its own money in the Project and other properties it obtained from Russi.

"Where the parties know that there is doubt in regard to a certain matter and contract on that assumption, the contract is not rendered voidable because one is disappointed in the hope that the facts accord with his wishes. The risk of the existence of the doubtful fact is then assumed as one of the elements of the bargain." *Gardner v. Meiling,* 280 Or. 665, 675, 572 P.2d 1012 (1977) (citing Restatement of Contracts, § 502(f) at 964).  Plaintiff assumed the risk that the project would not be profitable and thus, the Assumption Agreements are not subject to rescission because of mutual mistake of fact.  Plaintiff's claim should be dismissed.

## F.    CONCLUSION

For the reasons set forth above, Defendants respectfully ask this Court to grant their motion for summary judgment and dismiss Plaintiff's case in its entirety.  If the Court denies summary judgment in whole on Plaintiff's unjust enrichment claim, Defendants request that the Court grant partial summary judgment on the relief sought on that claim to permit Defendants to proceed with nonjudicial foreclosure so as to mitigate their damages.

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the applicable word-count limitation under LR 7-2(b) because the Court granted Defendants' request to file a memorandum over 11,000 words and this memorandum is 16,814 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED this 22nd day of May, 2025.

THE SMITH FIRM, P.C.

_____
David P. Smith, OSB #964301
The Smith Firm, P.C.
1754 Willamette Falls Drive
West Linn, OR 97068
dave@thesmithfirmpc.com
*Attorney for Defendants and Third-Party Plaintiffs recited above*

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on May 22, 2025, I electronically filed the foregoing

3  **DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT** and the

4  **DECLARATION OF DAVID P. SMITH IN SUPPORT OF DEFENDANTS' RENEWED**

5  **MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court of the United States

6  District Court, for the District of Oregon, using the CM/ECF system.

7      I further certify that all participants in the case are registered CM/ECF users, and that

8  service on those participants will be accomplished by the CM/ECF system on May 22, 2025.

9

10     DATED this 22nd day of May, 2025.

11

12                                         **THE SMITH FIRM, P.C.**

13

14

15                                         David P. Smith, OSB #964301
                                           *Attorneys for Defendants and Third-Party*
16                                         *Plaintiffs*

17

18

19

20

21

22

23

24

25

26

Page 1- CERTIFICATE OF SERVICE

**THE SMITH FIRM, P.C.**
*Attorneys at Law*
1754 Willamette Falls Drive
West Linn, OR 97068
(503) 657-6550
Fax: (866) 710-0666
Email: dave@thesmithfirmpc.com